## STARK v. AMERICAN DREDGING CO.
### No. 2864.

District Court, E. D. Pennsylvania.

Feb. 28, 1946.

Freedman, Landy & Lorry and Abraham E. Freedman all of Philadelphia, Pa., for plaintiff.

Evans, Bayard & Frick and Philip H. Strubing all of Philadelphia, Pa., for defendant.

WELSH, District Judge.

This is an action brought by the administrator of the estate of Joseph Cicarello, deceased, a seaman, for the benefit of the parents of the deceased, under the general maritime law and the Jones Act, 46 U.S. C.A. § 688. The case was tried before the Court without a jury.

### Findings of Fact

The Court makes the following findings of fact:

1. Samuel J. Stark was duly appointed administrator of the estate of Joseph Cicarello, deceased, by the Register of Wills of Philadelphia County, on September 3, 1942.

2. On October 26, 1941, Joseph Cicarello was a seaman employed by the defendant in the capacity of a deckhand aboard the dredge Baltic, a vessel owned, operated and controlled by the defendant.

3. On October 26, 1941, the dredge Baltic was engaged in deepening the bed of the outfitting basin of the New York Shipbuilding Corporation on the Delaware River between Pier 1 and Pier 2 at Camden, New Jersey, in navigable waters of the United States.

4. The dredge was, at the time facing bow in and secured to Pier 2 by a five inch manila line running from the aft port cleat of the dredge to the last riverward bit on Pier 2. Pier 2 was approximately 70 feet south of the dredge and Pier 1, to the north, was about 25 feet away.

5. The tide and wind was running to the north and the purpose of the manila line was to keep the dredge from drifting against Pier 1.

6. The dredge was also equipped with three spuds running vertically to the river bed, two forward and one aft; when these spuds rest securely in the river bed, they prevent the dredge from drifting and swinging about.

7. One of the duties of Joseph Cicarello was to row members of the crew and others to and from the dredge in a rowboat owned by the defendant.

8. At about 4 o'clock on the afternoon of October 26, 1941, Joseph Cicarello, in the course of his duties, rowed an inspector from Pier 1 to the dredge. He arrived at the stern end of the dredge, where a short ladder was located to permit the crew and others to board and leave the vessel, and after discharging his passenger, was requested by Thomas Thompson, a fireman, to row the latter ashore. Thompson descended the ladder and sat in the stern end of the rowboat. Joseph Cicarello was at the oars facing Thompson with his back toward the bow of the rowboat.

9. Joseph Cicarello proceeded to row toward a ladder suspended from Pier 1.

10. The route which he took necessarily crossed over the manila line which was then submerged in the water.

11. When the rowboat was 15 or 20 feet away from the dredge, and over the point where the manila line was submerged in the water, the line suddenly became taut without warning, caught the rowboat under its stern, lifted it into the air and caused it to capsize.

12. Both occupants were thrown into the water and Joseph Cicarello was not seen alive thereafter. His body was recovered from the water in the vicinity of Pier 1 about a half hour later.

13. Joseph Cicarello's death was caused by drowning.

14. At the time Joseph Cicarello set out on the fatal voyage, the dredge was in operation, dredging from the river bottom. This was accomplished by means of a bucket attached to a boom at the bow of the dredge. The bucket would be dropped down into the river bed either directly ahead or somewhat toward the port side of the dredge; after scooping up the mud it would be raised and then swung over toward the starboard side by means of a boom, where a scow was located to receive its contents. The swinging of the boom toward the starboard side would cause the stern end of the dredge to swing toward the port side, in the direction of Pier 1. This motion of the dredge caused the manila line to become taut and to be raised out of the water. The latter caused the capsizing of the rowboat and resulted in the death of Joseph Cicarello.

15. At the time of the accident Joseph Cicarello did not know, and had no reason

to anticipate, that the manila line would become taut, snap out of the water, and cause the rowboat to capsize.

16. At the time of his death, Joseph Cicarello was in good health and was 33 years and 9 months of age.

17. For a period of approximately four years prior to June 15, 1941 Joseph Cicarello was continuously employed as a member of the crew of the U. S. Army Transport Washington in the capacity of second cook. His annual earnings during that period approximated $2,000. He was employed on the dredge Baltic from September 24, 1941 to October 26, 1941, and during that period earned $152.30 which is equivalent to his rate of earnings on board the "Washington".

18. Joseph Cicarello was survived by his mother and father, who were dependent upon him for financial support.

19. Immediately prior to his death Joseph Cicarello contributed to the support of his parents in varying amounts, ranging from $10 to $25 monthly.

20. At the time of trial, which was four years after the death of Joseph Cicarello, the latter's mother was 58 years of age and his father about 61; both parents were in good health and the life expectancy of the mother was approximately 15 years.

## Discussion

■ It is conceded by the parties that the decedent was a "member of the crew" and therefore the Jones Act, 46 U.S.C.A. § 688, is applicable. In an action brought under this Act to recover for personal injuries or death the negligence of the defendant and proximate cause must be proved, and contributory negligence though it is not a defense to the action must be considered in connection with the diminution or apportionment of the damages.

■ The facts disclose that despite the availability of longer spuds, short spuds which were inadequate to secure the dredge to the river bed were used. This led at various intervals during the course of the dredging operations to the swinging about of the dredge toward the port side and forcing the submerged manila line, which ran from the aft port cleat of the dredge to the last riverward bit on Pier 2, to rise and become taut. That these facts which are substantially undisputed constitute an unsafe place in which to work is too plain to require much more than the mere statement. And it is well settled that under the Jones Act the negligent failure of a ship owner to furnish a seaman a safe place in which to work is actionable. Rey v. Colonial Nav. Co., 2 Cir., 116 F.2d 580; Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082. The responsibility of the ship owner also attaches when the negligent "failure to provide a safe place in which to work" was brought about by an act or omission of one of the officers, agents or employees. It was the duty of the defendant to warn the deceased, Joseph Cicarello, of the existence of the manila line and the consequent unsafe condition by posting a lookout. In failing to do so, the defendant breached this duty and we hold that the breach of this duty was the proximate cause of Joseph Cicarello's death.

■ The defendant argues that because there was a way by which the deceased could have reached the shore without going over the stern line the defendant had no reason to anticipate the presence of the deceased at the point of the accident and therefore there was no duty on its part to take precautions regarding the stern line and the periodic tautening thereof. It can hardly be disputed that there was a comparatively safe route open to the deceased in the direction of Pier 2. The argument, however, is based on an erroneous assumption that it was unsafe for the decedent to take the route which crossed over the stern line. There is nothing inherently hazardous about a line extending from the stern of a boat and submerged in the water at a depth sufficient for safe passage of a small boat. It can reasonably be inferred, from the fact that there is no evidence in the record to show that the route taken by the deceased had never been taken previously by him or any other member of the crew and further that no warning had been issued by the officers against taking such a route, that Joseph Cicarello had been granted permission to proceed to and from Pier 1 which crossed over the stern line.

Therefore, we hold that the route toward Pier 1 which crossed over the stern line and which was taken by the decedent was another safe route because there is nothing inherently dangerous about it and in all probability he had permission to use it. It was the defendant's voluntary act in permitting the alternate slacking and tautening of the stern line and its failure to provide a safe place in which to work and in failing to post a lookout which made the route crossing over the stern line unsafe, and it cannot now defend on the ground that it had no reason to anticipate the presence of the deceased. There is a further reason why Joseph Cicarello's presence should have been anticipated. Except for the intervening negligence of the defendant in failing to provide a safe place in which to work the decedent had the option of proceeding along two safe courses, one in the direction of Pier 2 and the other in the direction of Pier 1 which necessarily crossed over the stern line. The course which the deceased traveled was the more practicable course as the distance from the dredge to Pier 1 was about 25 feet and the distance to Pier 2 was about 70 feet.

 The defendant contends that the unsafe place in which to work constituted an "obvious danger" and that the deceased knew or should have known of the danger and that because he took this route which necessarily crossed over the stern line he was thereby chargeable with contributory negligence. Under the general maritime law and the Jones Act the doctrine of "comparative negligence" obtains. Contributory negligence is not a bar to recovery but it can be invoked for the purpose of mitigating damages. The Seeandbee, 6 Cir., 102 F.2d 577. Examination of the record discloses that the deceased had no actual knowledge of the danger. The sole question is whether or not the danger is so obvious that knowledge thereof may be imputed to the decedent. In determining this question the nature and definition of "obvious danger" must be applied to several facts of the instant case. A danger is obvious if it is manifest as to the sense of observation, open, and readily discernible. One of the duties of the decedent was to row members of the crew and others to and from the shore. In connection with this duty he frequently descended the ladder which was located in the middle of the stern. In descending the ladder the stern line which was hanging from the aft port cleat of the dredge must have been apparent to the decedent for it was located slightly to the left of the ladder. Also in rowing to and from shore the stern line must have been evident to the decedent for it is presumed that a person in addition to observing the view in his direct line of vision also observes the view on either side of him. However, the fact that the stern line was obvious to the decedent is insufficient to charge him with contributory negligence. Standing alone, there is nothing inherently or obviously dangerous about a stern line which is hanging from the stern of a ship and submerged in water. The real danger was the periodic tautening of the stern line and we hold that this condition was not obvious, and knowledge cannot be imputed to the decedent. This holding is based on several facts and circumstances. The stern line was placed on the afternoon of the accident and the decedent had no reason to suspect that the line would rise out of the water and become taut with the motion of the dredge. The unfamiliarity of the decedent with dredging operations is another important factor. The evidence shows that Joseph Cicarello for four years prior to his employment on the dredge Baltic had been employed as a member of the crew of the U. S. Army Transport Washington in the capacity of second cook, and in that capacity he could not have had many opportunities to gain experience concerning a dredge which is a particular type of ship. Finally, the testimony reveals that the spuds used were inadequate to secure the dredge to the river bed and this caused the drifting and swinging about of the dredge and the slackening and tautening of the manila line. It is difficult to perceive how knowledge of this situation can be imputed to the decedent particularly in view of the latter's inexperience with dredges and dredging operations.

 We feel that the above discussion involving contributory negligence

would be incomplete if we failed to make mention of the presumption which arises when an accident occurs and a party dies. The presumption is that a person dying in an accident is presumed to have used due care and we think that the presumption is applicable in this case. The evidence indicates that after the boat capsized the decedent disappeared and was not seen alive thereafter. The only reasonable conclusion to be drawn is that death was instantaneous. Conscious pain, substantially contemporaneous with death affords no basis for a separate award of damages. St. Louis, I. M. & S. R. Co., v. Craft, 237 U. S. 648, 35 S.Ct. 704, 59 L.Ed. 1160.

At the time of the trial Joseph Cicarello's mother and father were 58 and 61 years of age respectively and the mother had a life expectancy of approximately 15 years. The decedent prior to his death enjoyed good health, and it can reasonably be expected that he would have lived 30 years longer. He contributed to the support of his parents in varying amounts, ranging from $10 to $25 monthly. Taking these facts into consideration together with the elements of present worth of expected future contributions and the pecuniary loss sustained by the parents up to the time of trial we are of the opinion that the pecuniary loss to the parents is, and it is hereby fixed at, the aggregate sum of $3,000.

### Conclusions of Law

The Court makes the following conclusions of law on the findings of fact and discussion:

1. Defendant had the duty to provide the decedent with a reasonably safe place in which to work. The defendant should have anticipated the presence of the decedent at the point where the accident occurred and should have warned him of the peril to which he was subjected at the time of the accident.

2. Defendant was negligent in failing to provide decedent with a reasonably safe place in which to work in failing to warn decedent that the manila line was about to become taut and rise above the surface of the water, and in failing to equip the dredge Baltic with spuds sufficiently long to enable them to obtain a firm footing upon the bed of the river.

3. The failure of the defendant to furnish a safe place in which to work was the proximate cause of Joseph Cicarello's death.

4. The danger which was caused by the alternate slackening and tautening of the manila line was not obvious and the decedent cannot be charged with contributory negligence for having taken the route which necessarily crossed over the manila line.

5. The negligence of the defendant was the proximate cause of Joseph Cicarello's death and defendant is therefore liable for the pecuniary loss suffered by the parents of the deceased as a result of his death.

An order may be entered in conformity with this opinion.