Petition of **OSKAR TIEDEMANN AND COMPANY** for exoneration from or limitation of liability, as owners of the S.S. **ELNA II**, and

Petition of the **UNITED STATES** of America and Mathiasen's Tanker Industries, Inc., for exoneration from or limitation of liability as owners of the U.S.N.S. **MISSION SAN FRANCISCO**.

**Nos. 1764, 1765.**

United States District Court
D. Delaware.

Sept. 23, 1964.

Supplemental Opinion Dec. 8, 1964.

Thomas E. Byrne, Jr., of Krusen, Evans & Byrne, Philadelphia, Pa., H. James Conaway, Jr., of Morford, Young & Conaway, Wilmington, Del., for petitioner Oskar Tiedemann & Co.

Harold G. Wilson, United States Department of Justice, Washington, D. C., and Alexander Greenfeld, U. S. Atty., Wilmington, Del., for petitioner United States of America, etc.

Abraham E. Freedman, of Freedman, Borowsky & Lorry, Philadelphia, Pa., and Harold Leshem, of Leshem & Rubenstein, Wilmington, Del., for various claimants.

Wilfred J. Smith, Jr., of Smith & Gentile, Wilmington, Del., for Ruth Allen, claimant.

Victor F. Battaglia, of Theisen & Lank, Wilmington, Del., and William Warner, New York City, for Julius Black.

LAYTON, District Judge.

On April 14, 1960, this Court appointed a Commissioner to hear and report findings on a large number of claims for personal injuries and deaths resulting from a collision in the Delaware River on March 7, 1957, between the S. S. Mission San Francisco (Mission) and the Elna II (Elna).

The Commissioner heard and disposed of some fifty odd claims to which the following exceptions have been filed.

### THE BLACK CLAIM

Julius Black, Administrator of the Estate of David Black (hereafter called Black) filed two claims, one under the Jones Act, 46 U.S.C. § 688, against Mathiasen's[1] as the negligent employer and one against the United States and/or Tiedemann[2] under the Delaware Wrongful Death Act. 10 Del.Code Sec. 3704(b).[3]

---

1. The Mission San Francisco was owned by the government but operated under contract by Mathiasen's which furnished the crew, victualized her, and operated and controlled her completely except she was subject to orders covering destination, cargo, etc. by the United States.

2. Tiedemann was the owner of Elna II.

3. The awards made by the Commissioner did not result in duplications.

■ The Government excepted to the award against it under the Delaware Death Statute upon the theory that the award in favor of Black against Mathiasen's constituted the exclusive remedy for the wrongful death of seamen. Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686 (1930). It is true that the Jones Act by its terms gives a right of action in favor of a seaman against his employer alone and there can be only one employer within the meaning of the Act. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949). But although the Act may supersede state-created remedies against the employer, Lindgren v. United States, supra, it does not preclude actions against other tortfeasors, Gardiner v. Agwilines, Inc. (E.D. N.Y. 1939), 29 F.Supp. 348. Compare Petition of Petroleum Tankers Corporation (S.D.N.Y. 1960), 204 F.Supp. 727.

■ Before the Commissioner, Black took the position that he was not employed by the Government with the result that the Delaware Death Act was the proper remedy against the United States. The Government had full opportunity to contest Black's stand but in the words of the Commissioner:

"The Government has adamantly refused to pay any attention to the Black claim, the Black brief, or the importunities of the Commissioner that an answering brief be filed." Commissioner's Report, P. 26.

Accordingly, the Commissioner without benefit of briefs or argument on the part of the Government, took upon himself the responsibility of deciding the relationship of the United States to Black and concluded that he was employed by Mathiasen's, with the result that he found the Government liable under the Delaware Death Act.

Again, upon exception to the Commissioner's report, the Government had full opportunity to contest his conclusion that Mathiasen's was Black's employer but the Government proctor contented himself with a cursory brief alleging by way of conclusions (a) that both the United States and Mathiasen's were Black's employers or (b) that the Government's liability rested on the principle of respondeat superior. Neither of these propositions has merit. Even a casual reading of the cases would indicate that the question whether the Government or Mathiasen's was Black's employer was the key to this situation. Twice the Government had an opportunity to raise it and twice it failed. Probably the Commissioner answered the question correctly, but in light of the Government's indifferent attitude,[4] it will not be given a third opportunity to contest his conclusion. This case is seven years old and there must be an end to this litigation. This ground of exception is overruled.

Secondly, the Government has contested the Black award upon the theory that the claim under the Delaware Death Act was time barred by the provisions of 46 U.S.C. § 745 which reads:

"Suits as authorized by this chapter may be brought only within two years after the cause of action arises * * *."

In their joint petition for exoneration or limitation of liability, both the United

4. With regard to the Government's attitude concerning all of the claims he heard, the Commissioner said:
"A brief schedule was established and the brief for the majority of the petitioners was filed on June 17, 1963. The Government requested additional time for filing its brief and this was granted. No brief was filed on the extended date. Thereafter, the Commissioner called the Department of Justice attorney who had acted for the Government and Mathiasen's and was told that a brief would certainly be filed by September 30, 1963. No brief was then filed by the Government and no brief has since been filed, nor was any explanation, excuse or apology given by the Government for its failure to file a brief. This attitude of the Department of Justice was simply a continuation of its previous policy in this matter which ranged from mere laxness to complete abandonment of the interests of its clients." Commissioner's Report 2.

States and Mathiasen's alleged that Mission San Francisco was a "Public Vessel." The Public Vessel's Act (46 U.S.C. § 782) specifically provides that suits thereunder shall proceed in accordance with and be subject to the provisions of the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, including the two year statute of limitations contained in Sec. 745. Allen v. United States, 201 F.2d 263 (9th Cir. 1952) cert. denied 345 U.S. 957, 73 S.Ct. 939, 97 L.Ed. 1378 (1953); Phalen v. United States, 32 F.2d 687 (2d Cir. 1929).

The claim was filed well before the expiration of two years after the cause of action arose but it was a single claim referring neither to the Jones Act nor the Delaware Death Act and in no way suggesting that it sought a recovery under both. And it was more than two years after the accident before Black formally notified the United States that he sought a recovery under both the Jones Act and the Delaware Death Act. Thus, at first blush, there would seem to be some merit to the Government's position but closer examination reveals that the argument is only superficially persuasive. In the first place, as previously observed, the Commissioner did not allow a complete recovery under each act. Rather, under the Jones Act, he awarded a sum representing the annual contributions decedent would have made to the support of his parents during the pendency of their lives and under the Delaware Death Act the estimated sum decedent would have left as an estate at his death less, however, all sums he would have spent on himself and the amounts he would have contributed to his family. Thus, there was no duplication of awards.

Moreover, the ancient admiralty teaching is that " '[t]he rules of pleading in the admiralty are exceedingly simple and free from technical requirements'." Archawski v. Hanioti, 350 U.S. 532 (534), 76 S.Ct. 617, 620, 100 L.Ed. 676 (1956). A pleader is not required to name the statute upon which he relies.

It is necessary only that he allege facts which would permit recovery under a statute and, if so, he may even name the wrong statute. S. S. Nea Hellis, 116 F.2d 803 (2d Cir. 1941). An admiralty court may take judicial notice of an applicable state death act. Monongahela R. Consol. Coal & Coke Co. v. Schinnerer, 196 F. 375 (6 Cir. 1912). In my judgment, the Black claim, though brief and general in nature, states a cause of action under the Delaware Death Act within the purview of Admiralty Rule 52 and, having been filed within two years of the arising of the cause of action, is not time barred.

The third exception to the Black claim is filed by Mathiasen's. It is based upon the following language of Sec. 745:

"*Provided,* That where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim: * * * ."

Mathiasen's made no point of the possible applicability of the quoted language to this case before the Commissioner who, on his own motion, foresaw the possible problem and disposed of it in this fashion:

"It is possible that had the Government felt so disposed it might have made an argument that the provisions of 46 U.S.C.A., § 741 et seq., particularly § 745, would bar a claim against Mathiasen's [if] a claim against the United States was involved. However, it is concluded that agency as that concept is embodied in the provisions of 46 U.S. C.A., § 745 has not been interpreted to include a relationship similar to the one established under the present contract." Commissioner's Report, P. 26.

And even thereafter, Mathiasen's[5] failed to take an exception, raising the point

---

5. The same proctor represented Mathiasen's as the United States.

for the first time by letter in response to a request from the Court for comment on a completely different matter. Mathiasen's will not be heard to raise this contention at this late date for the same reasons which compelled me to deny the United States a hearing on the first issue discussed herein. This ground of exception is also overruled.

The Commissioner's findings in re the claim of Julius Black, Administrator of the Estate of David Black, deceased, are sustained.

Whether Maintenance & Cure for Elna Seamen is solely the liability of Tiedemann, or is the liability of the Elna fund primarily and the United States & Mathiasen's secondarily:

## I.

The United States and Mathiasen's have excepted to the Commissioner's report on the ground that the maintenance and cure awards to certain of the Elna seamen[6] should provide that they are recoverable against Tiedemann. The Commissioner merely awarded various amounts for maintenance and cure and said nothing about which tortfeasors, the United States, Mathiasen's and Tiedemann, would be liable.

It is my conclusion that the matter cannot be decided here but will have to await the entry of a final decree for the reason that Tiedemann appears to be an interested party but has had no opportunity to be heard. The Commissioner has determined the amount due each claimant for maintenance and cure. Prior to the entry of the final decree this Court, after notice to Tiedemann, will rehear this question and make a final determination as to primary liability.

Claims for prejudgment interest on behalf of Black, Allen, Andanar, Reneau, McKenna and all clients of Abraham E. Freedman, Esquire

In his brief to the Commissioner, Julius Black, alone of all claimants, claimed prejudgment interest. He cited no authority therefor and the Commissioner denied such interest. All claimants (excepting Priegue) took exception to the failure of the Commissioner to allow prejudgment interest. Two questions are presented. Does the failure of the claimants (except Black) before the Commissioner to claim interest for the period between death or injury and the award bar this court from taking jurisdiction over, and disposing of, this matter? As a matter of law, does the Admiralty permit such an award under these circumstances?

From time immemorial the Admiralty has favored seamen, 4 Benedict, The Law of American Admiralty § 621 (6th ed. 1940), I think, on occasions, beyond just reason in modern times. Nevertheless, this solicitude persists. Moreover, Admiralty pleading is neither as precise nor formal as in the common law courts. Dupont De Nemours & Co. v. Vance, 60 U.S. (19 How.) 162, 15 L.Ed. 584 (1856); Richfield Oil Corp. v. United States, 248 F.2d 217 (9 Cir. 1957). And this would be particularly so, I believe, with respect to pleadings before a Commissioner. Consequently, exceptants will not be penalized for their failure to raise the prejudgment interest question before the Commissioner.[7]

Having only one claim thereto, and not a single citation to authorities,[8] it is little wonder that he adopted the settled common-law rule and denied the Black claim. The law on this question,

---

6. Bodden, Carrion, Jiminez, Levy, Malvar, Sprott, and Yhap. The exception also named Martinez, Priegue and Rodriguez. However, no award for maintenance and cure was made for these three.

7. Moreover, it seems to be the practice of some jurisdictions (for instance, the Eastern District of Pennsylvania) not to

determine the award of prejudgment interest until the time of the entry of final decree.

8. Moreover, there remains the question of whether prejudgment interest can run against the United States. See Title 46 U.S.C. § 745, and § 782.

although in a state of confusion,[9] seems clearly to indicate that, insofar as concerns this Circuit, at least, prejudgment interest should be allowed in Admiralty from the date of injury until the date of the final decree. Not only does the Second Circuit, one of the leading Admiralty courts, allow prejudgment interest, but, by way of persuasive analogy, so does this Circuit.

Among those Circuits favoring prejudgment interest are Petition of City of New York, 332 F.2d 1006 (2 Cir. 1964); Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 96 A.L.R.2d 1085 (2 Cir. 1961), cert denied 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962); National Airlines, Inc. v. Stiles, 268 F.2d 400 (5 Cir. 1959).

The rationale underlying the allowance of prejudgment interest is stated in In Matter of Petition of City of New York to be this:

"We said in the Moore-McCormack case that 'when a court fixes damages to compensate for a loss which occurred in the past, there should be some allowance for the period between the date of the loss and the date of judgment. Recompense may thus be given for the further loss in the postponement of the receipt of compensation. In all too many instances the delay in reaching cases for trial brings suffering and privation to those who were dependent on the deceased. Even the more fortu-

nate of the bereaved may have been been forced to borrow money at interest to meet their expenses. * * [T]he defendants who are ultimately directed to pay have had the use of the money declared to be due. * *' Supra at 594. It is the combination of these two elements, the immediate loss to the plaintiff and the delay in the payment of compensation by the defendant that warrants the granting of prejudgment interest as a proper element of damages in fixing the loss to the dependents of decedents who bring suit in a court of admiralty." 332 F.2d at 1008.

A number of Circuits have awarded prejudgment interest in Admiralty cases involving property loss. The President Madison, 91 F.2d 835 (9 Cir. 1937); The Wright, 109 F.2d 699 (2 Cir. 1940); Geotechnical Corp. of Delaware v. Pure Oil Co., 214 F.2d 476 (5 Cir. 1954). And in The Manhattan, 85 F.2d 427 (3 Cir.) cert. denied sub nom. United States v. The Bessemer, 300 U.S. 654, 157 S.Ct. 432, 81 L.Ed. 864 (1936), a case involving property loss, the Third Circuit said this:

"Until an award is made of the damages, interest qua interest is not allowed, but delay in making compensation is an element in determining the damages. Damage is sustained as of a certain date. What the damage is may not be and is not affected by the time when estimated, but the damage is as found, and an

9. Some Admiralty courts have refused to allow an award for prejudgment interest. The Argo, 210 F. 872 (9 Cir. 1914); Burrows v. Lownsdale, 133 F. 250 (9 Cir. 1904). In other cases prejudgment interest has been given. Petition of City of New York, 332 F.2d 1006 (2 Cir. 1964); Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 96 A.L.R.2d 1085 (2 Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962); National Airlines, Inc. v. Stiles, 268 F.2d 400 (5 Cir. 1959). There is also authority that an award of prejudgment interest is discretionary with the court. The Wright, 109 F.2d 699 (2 Cir. 1940); Sabine Towing Co. v. Brennan, 85 F.2d 478 (5 Cir. 1936); Gardner v. National

Bulk Carriers, 221 F.Supp. 243 (D.Va. 1963). A rationale upon which prejudgment interest is founded is that the plaintiff has suffered a loss by not having the money of his damages from the date of injury to the date of judgment. Moore-McCormack Lines, Inc. v. Richardson, supra; Utility Service Corp. v. Hillman Transportation Co., 244 F.2d 121 (3 Cir. 1957); see The Hygrade No. 24 v. The Dynamic, 233 F.2d 444 (2 Cir. 1956). However, there is some support for awarding prejudgment interest on a theory of unjust enrichment. See Petition of City of New York, supra; Moore-McCormack Lines, Inc. v. Richardson, supra.

award made on one date is not the equivalent of an award made at an earlier date. The delay thus enters into the late award as an element of loss, and the damage awarded is for a sum which is the equivalent of what would have been a smaller sum if earlier awarded. The difference between loss and interest thus becomes little more than a difference in words, but it none the less exists in theory." 85 F.2d at 429.

If delay in making compensation in a property damage case is considered to be an element of damage, there is substantially greater reason for applying the same reasoning in cases of personal injury or death involving, as they do, the human elements of anxiety, shock and grief. And, if this proceeding is a fair example, the delay attendant to the disposition of Admiralty cases of this sort is a real source of concern because it is now some seven years since the collision occurred. However, Title 46 U.S.C. § 745 and Title 46 U.S.C. § 782 must be borne in mind. Section 745, dealing with the Suits in Admiralty Act, provides that interest against the United States begins to run on the date suit is instituted, while § 782 dealing with the Public Vessels Act, interest runs from the date of judgment. Both the United States and Tiedemann have alleged that the Mission was a Public Vessel.

I think it desirable that this point be further briefed and argued before entry of a final decree.

Whether the Commissioner erred in limiting productive life expectancy. Allen, Andanar and Reneau.

This point involves a number of exceptions all made on behalf of claimants Allen, Andanar and Reneau. It is contended that the Commissioner erred in

(1) limiting life expectancy

(2) admitting into evidence and adopting as a standard certain figures and tables contained in a pamphlet published by the Maritime Administration, Govt. Ex. D.C.M.C.–1 ("Survey of Licensed Officers of the American Merchant Marine, July-December 1957.")

(3) failing to make any allowances for shore-side employment beyond his findings of productive life expectancy at sea

(4) failing to consider the value of pensions and other fringe benefits which would have been due and payable after retirement from the sea.

In submitting their claims to the Commissioner, the claimants took the position that, in calculating the loss of pencuniary contributions suffered as a result of the deaths of their decedents, the Commissioner should have assumed that the decedents would have continued to pursue their occupations actively to the full extent of their life expectancies. The Commissioner declined to make such a finding. He awarded an amount for loss of contributions based upon the assumption that Allen would have continued to work as a Master until the age of 67 (rather than 75 as proposed in the claimants' brief), that Andanar would have continued to work as a chief steward until the age of 65 (rather than 75), and that Reneau would have continued to work as a boatswain until the age of 65 (rather than 70). He awarded nothing for loss of contributions beyond their retirement from the sea.

The Commissioner based only the Allen calculation upon Govt. Ex. D.C.M.C.– 1. The others were based upon Mathiasen's Ex. 1 which listed the ages of five highest wage earners in each occupation employed by Mathiasen's for the years 1957–61. (See Commissioner's Report, pp. 18, 22, 30).[10]

The Commissioner did not err in admitting D.C.M.C.–1 into evidence. Contrary to the assertions in the claimants' main brief, I cannot find where any objection was raised when the Government

---

10. D.C.M.C.–1 could have been used only for Allen. It deals only with licensed officers and not stewards or boatswains.

moved to admit this exhibit into evidence. (See R. 5324–26). It is too late to allege error in its admission. Moreover the same table was used in Petition of Moore-McCormack Lines, Inc., 184 F.Supp. 585, 592 & n. 8 (S.D.N.Y. 1960), modified 295 F.2d 583 (2 Cir. 1961), cert. denied 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962), and I can see no reason for holding that it was inadmissible here.

■■■ The Commissioner did not err in limiting his calculations of the maritime earnings of the decedents to their retirement ages as best he could determine them. A man's loss of income from an occupation lasts only so long as he would have continued to pursue that occupation. See McWeeny v. New York, N.H. & H.R.R. Co., 282 F.2d 34, 35–36 (2 Cir. en banc), cert. denied 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960). This was a question of fact to be determined by the Commissioner. I do not find the ages he used to be clearly erroneous.[11] Indeed, I suspect that they are reasonably charitable.

■■■ Although the claimants first asserted in their briefs that there was evidence in the record of what the decedents would have earned from shore-side employment after their retirement from the sea, my search of the record reveals none and after inquiry, the claimants admitted that there was none. However, they now insist that the Court take judicial notice of the fact that retired seamen invariably obtain employment ashore and work for the rest of their lives. While this fact may often be true, its universality is far short of the certainty required for judicial notice. Moreover, it affords no basis for fixing any definite amount of income. With the record as it was, the Commissioner's failure to find any income from shore-side employment after retirement from the sea was not error, particularly since the claimants did not even argue this to the Commissioner, advancing instead the contention that the decedents would have continued to work in their maritime occupations for the entire course of their life expectancies. If the Commissioner had done otherwise, he would only be speculating. See Petition of Moore-McCormack Lines, supra, 184 F.Supp. at 592–593; Southern Pac. Co. v. Guthrie, 180 F.2d 295, 303 (9 Cir. 1950).

There is no need to reach here the legal question whether loss of pension, social security and other fringe benefits should be considered in assessing damages for wrongful death. See 81 A.L.R.2d 949 (1962). The status of alleged post-retirement income from pension, social security, and other fringe benefits is the same as that from shore-side employment. There was no evidence of the amounts to which the decedents would have been entitled had they lived to retirement and beyond. It is true that exhibits introduced into evidence showed that retirement plans *did* exist and showed the *amount* of employer contributions to such plans, Ex. NMU 2, 3 and 5, MMP 1 and 2 (Reneau 7 and 11). And the wage records of the men in question show employer contributions to the social security fund. But *nowhere in the evidence* is there any indication of the *amount* to which the claimants' decedents were entitled and under what conditions they were so entitled. Apparently recognizing the deficiencies in their evidence, the claimants have now enclosed in a letter to the Court specific data on the National Maritime Union and Masters, Mates & Pilots pension plans. These documents come too late. In this respect, the claimants are in the same position as were the United States and Mathiasen's in connection with the Black

---

11. The Commissioner repeated the data in Table 10b of D.C.M.C.–1 which indicates that of the 1000 men surveyed who held master's licenses and were serving as such, only 6 were born before 1890. Commissioner's Report, p. 18. Furthermore, Table 7 shows that only 23 of 2723 men with master's licenses who were still active in master's or lower positions were born before 1890 and that only 6 of these were still serving as masters. And Chart VII–A shows 5.1% of 1000 active masters were over 65.

claim. They are foreclosed from presenting further evidence. There was no evidence upon which the Commissioner could have awarded the claimants any amounts for loss of contributions due to any income which the decedents would have received after their retirement from the sea. These exceptions are overruled.

### Pain and Suffering of Decedents Allen, Andanar and Reneau

Counsel for Allen, Andanar and Reneau have excepted to the Commissioner's failure to make any allowance for pain and suffering of the decedents in the uncertain period which elapsed between the accident and their deaths.

The Commissioner stated the law governing this situation correctly:

"Awards for pain and suffering of the decedent prior to death is recoverable if proved. Holliday v. Pacific Atlantic S.S. Co., 117 F.Supp. 729 (D.C.Del.1953). However, no award will be made unless the evidence shows that time elapsed before death. Tate v. C. G. Willis, Inc., 154 F.Supp. 402 (E.D.Va.1957); Stark v. American Dredging Co., 66 F. Supp. 296 (E.D.Pa.1946)." Commissioner's Report, p. 6.

Similar language can be found in St. Louis, Iron Mtn., etc. Ry. v. Craft, 237 U.S. 648, 655, 35 S.Ct. 704, 705, 59 L.Ed. 1160 (1915) followed by Great Northern Ry. Co. v. Capital Trust Co., 242 U.S. 144, 37 S.Ct. 41, 61 L.Ed. 208 (1916):

" * * * such pain and suffering as are substantially contemporaneous with death or mere incidents to it, as also the short periods of insensibility which sometimes intervene between fatal injuries and death, afford no basis for a separate estimation or award of damages under statutes like that which is controlling here."

With respect to Allen and Reneau, the Commissioner stated that "in the absence of any evidence as to whether decedent[s] survived the explosion, no allowance is made for this item." (Commissioner's Report, pp. 20, 32.) With respect to Andanar, he stated "there is no evidence of any conscious pain or suffering on the part of Andanar prior to his death." (Commissioner's Report, p. 23.)

If Commissioner meant by this language there was no evidence whatever to sustain a finding of pain and suffering, he was in error. If, on the other hand, he intended to say, as I think, that the evidence on the point was not sufficient to persuade him as a fact finder that decedents suffered conscious pain and suffering prior to death, then the situation would be squarely governed by United States v. Kirkpatrick, 186 F.2d 393 (3 Cir. 1951).

The evidence before the Commissioner came in the form of hypothetical questions put to Dr. Aronson, claimants' expert, who is a medical examiner for the City of Philadelphia. As such, it is his task to ascertain the causes of deaths from other than natural causes. (R. 279–81.) Dr. Aronson was not an explosives expert and was not qualified to testify as to the direction, velocity and force of any particular explosion but did know that the force of an explosion is not always uniform. (R. 307–08.) He never examined the bodies of Allen, Andanar and Reneau. (R. 291.) Moreover, he was not very knowledgeable on the structural characteristics of a tanker like the Mission. (R. 299–303.) Dr. Aronson was asked to assume (1) that the Elna II struck the Mission just below her bow and tore a hole in the side of the Mission before she started to slide down the side of the Mission, (2) that as a result of the collision there was a tremendous explosion or explosions in the Mission tanks which rent the vessel apart, devastated her hull, tore out her sides, and caused the midship housing to come right down in the water, (3) that ten lives were lost of the 45 men aboard, including Allen, Andanar and Reneau, (4) that just prior to the collision Andanar and Reneau were in their quarters at the upper level of the after end of the ship, (5) that Allen was in the midship housing on the bridge or in

his quarters (midship housing also), (6) that a lookout who was posted on the bow of the Mission was stunned and hurled about during the explosions but never lost consciousness, (7) that of the 35 who survived, most, if not all, were quartered inside, and they were stunned and hurled about but not rendered unconscious. (R. 283–285, 305–07.) The doctor was asked to give his opinion as to the pain and suffering endured by the three men prior to their deaths. He answered that these men survived the explosion (because the others did so), remained conscious and, prior to death by drowning, were subject to the physical and psychiatric trauma of the explosion and collision. (R. 287 and R. 307.)

While Dr. Aronson was an expert on the subject of death from unnatural causes, clearly he was no expert on the effect of explosive forces in tankers. Inasmuch as a number of the crew who were in their quarters survived the explosion, there is, of course, an inference supporting Dr. Aronson's conclusion that these three decedents were trapped in their quarters and drowned, experiencing pain and suffering in the process. But seven others were killed and there is no evidence as to how they met their deaths. The trial court found that "when she [Mission San Francisco] began her last voyage, her tanks were in a condition of danger comparable to the transportation of a cargo of explosives"; that "* * * the explosion of the Mission was perhaps the most violent ever known in the tanker trade * * *." Petition of Oskar Tiedemann & Co., 179 F.Supp. 227, 237 (D.Del.1959), and that "[t]he collision was followed by two shattering explosions aboard Mission as the result of which her midship housing [crew and officer quarters] collapsed and sank into her hull, she broke in two and sank very swiftly." 179 F.Supp. at 230.

The deaths of these ten persons in a catastrophe of this magnitude would also support a counter inference that

death followed so swiftly on the heels of the explosion as to justify the application of the language above quoted from St. Louis, Iron Mtn., etc. Ry. v. Craft, supra.

I conclude this is the view the Commissioner took of the facts. It is my view. The Commissioner was in the shoes of a jury with circumstantial evidence pointing both ways. His decisions on facts will not be interfered with by this Court. United States v. Kirkpatrick, supra.

Propriety of deducting federal income taxes in determining damages for loss of future earning power.

Claimants Allen, Andanar and Reneau took exceptions to the Commissioner's Report on the ground that he erred in deducting estimated income taxes from future earnings. Petition of Moore-McCormack Lines, Inc., 184 F. Supp. 585 (S.D.N.Y.1960). However, this deduction for income taxes was only for the period between the injury or death and the award,[12] the Commissioner stating at page 5 of his report that no taxes were deducted beyond the date of his award for the reason that "the matter then becomes too speculative."

There is some authority for the proposition that estimated income taxes should be deducted from an award of future earnings. Floyd v. Fruit Industries, Inc., 144 Conn. 659, 136 A.2d 918, 63 A.L.R.2d 1378 (1957). One reason sometimes advanced is that personal injury awards are not subject to federal income taxes. 2 Harper & James, The Law of Torts § 25.12 (1956); Sec. 104 Internal Rev. Code 1954. But this is not necessarily true in an award in death cases.

In any event, the decided weight of authority is to the contrary. As stated in Note 4, 63 A.L.R.2d at page 1399:

"* * * the award of damages should be based upon the plaintiff's gross earnings * * * and should not be reduced because of any income tax saving which may result

12. On the Allen claim, the Commissioner, probably inadvertently, deducted esti- mated taxes for both past and future losses.

\* \* \* from the fact that the damages will be exempt from income tax."

The rationale underlying the majority view is that, for various reasons including changes in tax rates, uncertainty of proper exemptions due to changes in dependents, divorce, etc., the estimation of future federal taxes is too speculative. Stokes v. United States, 144 F.2d 82 (2 Cir.1944). The Commissioner's decision is affirmed. But inasmuch as there are no uncertainties in computing the taxes from the date of injury until the award, I sustain the Commissioner's conclusions in that respect. However, as to the award for future damages in the Allen claim, the amount of the award should be recomputed for the reason that the Commissioner seems to have deducted income taxes from these future damages.

### Care, counsel and guidance to Widows

Claimants Mrs. Allen and Mrs. Reneau have excepted to the Commissioner's Report on the ground that he erred in failing to make any allowances for the value of counsel, care, and guidance rendered them by their deceased husbands. The Commissioner did award them amounts for chores and tasks which the decedents had performed about their homes (Commissioner's Report, pp. 19 and 31) but he concluded that the record did not contain evidence which would justify a payment to either widow for care, counsel and guidance.

A review of the record on Reneau indicates nothing more than generalities indicating that he was a good husband and that he came home frequently and that he occasionally went dancing with his wife. (R. 47, 48, 82, 83, 88, 89, 59.) The evidence on Allen was of the same nature (R. 203-05, 262) except that Mrs. Allen did testify that he was constantly in touch with her and the children by long distance telephone, telegrams, radiograms and letters (R. 207), that he always tried to help her if somethng bothered her and that his help comforted her (R. 262-63).

I conclude that the Commissioner was correct in making no allowance for care, counsel and guidance to Mrs. Allen and Mrs. Reneau.

The evidence here is weaker than in Meehan v. Cent. R. R. of New Jersey, 181 F.Supp. 594 (S.D.N.Y.1960) where the court, in deciding whether or not the evidence came within the pecuniary loss requirement of the New Jersey Death Statute, stated:

"What sum should fairly be allowed for aid and assistance and services lost by the widow? The testimony on this is most meager. Mrs. Gill testified that her husband assisted her 'completely' and that she went to him and he helped her with her problems and handled the sale of their Staten Island house and the purchase of the New Jersey home.

"With such a paucity of proof, this court is unable to see how such facts can be translated into monetary or pecuniary loss. Consequently, nothing should be awarded for this factor since plaintiff has not sustained his burden of proving such damage. Apparently this proof to prevail must be more than 'sketchy.' " 181 F.Supp. at 623.

See also First Nat. Bank in Greenwich v. National Airlines, Inc., 171 F.Supp. 528 (538) (S.D.N.Y.1958), aff'd, 288 F.2d 621 (2 Cir.) cert. denied sub nom. Kessler v. National Airlines, Inc., 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57 (1961).

### War Risk Insurance Payments.
### Allen

While the proctor for Mrs. Allen concedes that the $5,000 of War Risk Insurance has been paid and that the United States and Mathiasen's are entitled to a set-off, he still maintains that, insofar as concerns Tiedemann and/or the Elna, no set-off exists and that the sum may still be collected from the Elna fund under either the marshalling of assets or the collateral source doctrine.

As in the case of the claim against Elna for maintenance and cure, it is my

feeling that this question must await disposition at final decree for the reason that Elna must be given a chance to be heard before any final judgment can be entered on this matter. At that time, the proctor for Elna will be given an opportunity to submit his arguments and a final decree made thereafter.

Moreover, although I do not decide the matter now, the attention of Mrs. Allen's proctor is directed to the question whether the Commissioner in fact made any award to her which could be the subject of liability on the part of Elna. While admittedly she filed a claim against Tiedemann, nevertheless, she relied solely on the Jones Act for recovery both for the death and survival actions. As stated elsewhere, the Jones Act provides a single remedy against the seaman's employer and, Tiedemann could not have been Captain Allen's employer. If this analysis of the matter is correct, the question becomes moot.

### Measure of the loss of contributions suffered by dependents of decedents—Fractional shares.

#### Allen, Andanar and Reneau

These three claimants have further excepted to the Commissioner's Report on the grounds (1) that it was error for the Commissioner to deduct from the decedents' income fractional shares representing decedents' self-maintenance, in lieu of accepting the proven figures demonstrating decedents' actual personal needs and expenses and (2) in failing to consider the board and lodging which decedents obtained while living on board ship.

 Of course, the amount fixed as the pecuniary loss suffered by dependents must bear some reasonable relation to the evidence, Williams v. Dowling, 318 F.2d 642 (3 Cir. 1963) but the evidence actually adduced may make this very difficult. Nor are these cases exceptions to the rule. As in many cases of this sort, a wife without business experience and with little knowledge of her husband's affairs presents on direct examination a fairly straightforward picture of family finances only to become so confused on cross-examination as to render the weight of her testimony subject to substantial doubt. This case is no exception.

Under such circumstances, courts have sometimes resorted to the arbitrary method of deducting a fractional share representing the proportion the decedent represented to his dependents. Petition of Moore-McCormack Lines, 184 F.Supp. 585 (S.D.N.Y.1960).

The instant exceptions present typical facts for the application of some such arbitrary rule of thumb. For instance, in the Andanar claim there was little or no proof either as to the amount of decedent's contributions to household expense or as to the amount he retained for his own benefit. And in Allen, while Mrs. Allen testified in direct examination that her husband retained but $500 or $600 out of their total annual earnings for his own needs, she finally admitted on cross-examination that for one year he might have retained as much as two thousand dollars. Likewise in Reneau, while Mrs. Reneau testified her husband (a boatswain whose salary was much less than Allen's) retained but $400 annually for his own needs, it is possible to estimate from cross-examination that he kept as much as $1600.

 Under circumstances such as this, a reasonable latitude should be extended to the Commissioner in deciding the most equitable method of estimating results. Compare Sabine Towing Co. v. Brennan, 85 F.2d 478 (5 Cir. 1936) (completely ignored the proof on self-maintenance of decedent and arbitrarily decided it would be fair to conclude that widows and children would have received one-half of what decedent earned); O'Connor v. United States, 251 F.2d 939 (2 Cir. 1958) (first deducted amounts that decedent retained for self and then deducted from the balance his fractional share of the amount available for the support of the entire family, ⅓ for family of 3); Gardner v. National Bulk Carriers, 221 F.Supp. 243 (E.D.Va.1963) (followed O'Connor approach but because

decedent was a seaman who spent the greater portion of his time away, the court refused to adopt the fractional share representing his proportion to the family but, instead, used a lesser fraction (⅙ for a family of four); Moore-McCormack, supra (arbitrarily used the decedent's fractional share of the total number of family).

In a case where the record as to self-maintenance is uncertain and the decedent was a seaman, I feel the Commissioner might well have adopted the approach in Gardner awarding a smaller fraction for self-maintenance because of the fact that decedent was absent from home most of the time.

Therefore, in Allen I will deduct ⅕ (instead of ¼) for the period until the oldest son became 21 (October 29, 1960) and ¼ (instead of ⅓) of the figure for the remaining period.

In Reneau, I will deduct ⅙ (instead of ⅕) until January 1, 1979; ⅕ (instead of ¼) from January 1, 1979 to January 1, 1980; and ¼ (instead of ⅓) from January 1, 1980 to January 1, 1981.

However, in Andanar where the testimony both as to decedent's contributions to household expenses and as to amounts retained for his own use annually was unsatisfactorily vague, I will accept the Commissioner's formula.

Pain, suffering, loss of earning power.

McKenna

In his brief to the Commissioner, McKenna asked for $396,032.79 in damages for past pain and suffering and loss of life's pleasures, maintenance and cure, past losses of earning power, future losses of earning power, and future pain and suffering and loss of life's pleasures. (Brief, p. 260–64.) The Commissioner awarded only $2500 for past pain and suffering and loss of life's pleasures (he had asked for $44,500) and only one month's maintenance and cure (he had asked for 6½ years). Nothing was awarded for other elements of recovery. (Commissioner's Report, p. 114–15.)

In connection with his allowance the Commissioner stated flatly he did not believe McKenna's testimony stating at page 115 of his report:

"As a result, the history given the doctor was fraudulent and it is obviously not a proper base upon which to make a prognosis. Furthermore, the perjury involved in his testimony before the Commissioner casts doubt upon all of McKenna's statements. These facts, coupled with his prior history of jumping from job to job, indicate to me that his departure from the sea was of his own choosing and not dictated by any psychotic condition. Accordingly, there is insufficient evidence upon which to make any award either for past or future earnings or for future pain and suffering."

A finding of fact by a Commissioner based upon conflicting testimony and a determination of the credibility of the witnesses before him will not be disturbed unless clearly erroneous. United States v. Kirkpatrick, 186 F.2d 393 (396) (3 Cir. 1951).

The Commissioner's conclusions will not be overruled in this claim.

Whether Commissioner erred in discounting all awards for future at 4%. All claimants represented by Mr. Freedman.

The Commissioner's decision to discount all awards for future losses at 4% is well within his field of discretion and is affirmed.

Supplemental Opinion

In my opinion of September 23, 1964 disposing of exceptions to the Commissioner's report, it was pointed out that three matters remained for disposition (1) whether prejudgment interest should be allowed on the awards made by the Commissioner (2) against what parties should the awards to certain of Elna's crew members for maintenance and cure be assessed and (3) whether the proceeds of certain war risk insurance paid to decedent, Allen, may be credited or set off by the United States against the Commissioner's award to the Allen estate.

The Court asked the parties for briefs on these three points but the United States failed to file its brief as directed so that I am forced to proceed without any aid from that source.

 In my opinion of September 23, 1964, it was held in effect that prejudgment interest should be allowed on all claims in this proceeding subject, however, to the effect of the Suits in Admiralty Act, Title 46 U.S.C. § 745 and the Public Vessels Act, Title 46 U.S.C. § 782. A further consideration of these two acts convinces me that, insofar as concerns the United States, it can be sued only as provided by the two cited acts with the result that interest can be recovered only to the extent permitted by those acts. If the Mission was a "Merchant Vessel," interest can be awarded from the date that suit was filed but if she was a "Public Vessel," interest can be awarded only from the date of the rendition of judgment. The claimants take the position that the Mission was a Merchant Vessel and the United States, to the contrary, that she was a Public Vessel. The record is very meager as to the history of the Mission's past career. We know that the Mission was manned by a civilian crew; that she had delivered a cargo of aviation jet gasoline to Newark, New Jersey; and, just prior to the collision, was returning in ballast to Paulsboro, New Jersey, to take on new cargo. Petition of the United States, 179 F.Supp. 227, 230 (D.Del.1959). Most of the information we have about the operation of the Mission is contained in Chief Judge Wright's opinion in the Petition of United States, 155 F.Supp. 714 (D.Del.1957) where, in construing the matter of the charter under which she was operated, he said at page 715 that the Mission was owned by the United States and operated by Mathiasen's Tanker Industries, Inc., pursuant to an agreement with the United States Navy's agency, the Military Sea Transportation Service. Further, at page 717, it is stated:

"This agreement provides that the contractor (Mathiasen) 'shall manage and conduct the business in connection with the operation of such tankers as may be furnished to it by the Government * * *.' Article 1(a). The contractor 'promises to manage and conduct the business of the Government with respect to such tankers * * *.' Article 1(b). All tankers 'shall be redelivered to the Government in such condition as the Government may specify * * *.' Article 15. The fair intendment of these provisions is that possession of the vessels passes to the contractor under the agreement.

"The management standard is similarly met. The contractor shall 'equip, fuel, supply, maintain, man, victual, and navigate the tankers.' Article 5(b). The contractor shall 'procure all personnel necessary to fill the compliment of each tanker * * *.' Article 5(c). The contractor shall use the regular labor contract and 'under no circumstances [shall he] execute separate labor agreements limited solely to the operation of Government owned tankers.' Article 5(d). Thus, Mathiasen must be considered a 'charterer' within the meaning of the applicable statutory provision."

If the Mission had been privately owned, the question whether she was a Public or Merchant Vessel would have to be decided by reference to the charter under which she was being operated. Calmar S.S. Corp. v. United States, 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140. But the Mission was not privately owned, rather, she was owned by the United States.

 Under such facts, the cases seem to determine the character of the ship by reference to the nature of the services she rendered. The Western Maid, 257 U.S. 419, 42 S.Ct. 159, 66 L.Ed. 299 (1922); The Lake Monroe, 250 U.S. 246, 39 S.Ct. 460, 63 L.Ed. 962 (1919); Gilmore & Black, The Law of Admiralty 774 (1957). The nature of the service rendered should be determined by looking to the specific service being rendered at the time that the asserted claim arose.

See The Western Maid, supra, 257 U.S. at 431–432, 42 S.Ct. at 160–161; The Lake Lida, 290 F. 178 (4 Cir. 1923); Geo. W. Rogers Construction Corp. v. United States, 118 F.Supp. 927, 934 (S.D. N.Y.1954). It is reasonable to assume that Congress did not intend to subject the government to interest liability on equal terms with merchants, except at such specific times as when the government was engaged in an activity in competition with merchants. To subject the government to this liability because of competition with merchants at some previous time would seem to be a clear misconstruction of the statute.[1]

The facts of this case demonstrate beyond any doubt that Mission, returning from her last voyage, had been delivering a cargo of jet aviation fuel to Newark, New Jersey, and, thus, was engaged in the public service of the United States for defense purposes.[2] And not only being owned by the United States but being engaged in a defense activity, it would logically follow that she should be regarded as a Public Vessel. As said in Geo. W. Rogers Const. Corp. v. United States, supra at 934 (S.D.N.Y.):

> "A vessel owned absolutely by the United States through the Maritime Commission and operated by officers who are civil service employees of the United States and by a crew paid by the United States through its general agent, is a 'public vessel' within the purview of the Public Vessels Act, T. 46 U.S.C.A. § 781 et seq., unless it is engaged in transporting cargo for hire for private shippers."

Claimants argue that because the crew of the Mission was a civilian crew, she should be classed as a Merchant Vessel.

But the tanker Cayuse in the case just cited, except for her officers, also had a civilian crew. Nor have I been cited to a case wherein the nature of her crew was determinative of the character of the vessel. Moreover, in my judgment, the fact that the United States was not at war at the time this collision occurred, cannot, as claimants contend, change the result. As said in Geo. W. Rogers Const. Corp., supra at 934:

> "The rule should not be different while we are at peace. Fuel oil is today as essential to the operation of the Navy as was coal forty years ago."

Likewise, it would seem inescapable that jet fuel is essential to the operation of Navy planes.

Inasmuch as, in my judgment, Mission at the time of this collision was a Public Vessel, interest on claims in this proceeding, insofar as concerns the United States, can be calculated only from the date of the judgment and insofar as concerns any other party from the date of the accident. As to all parties, the rate of interest shall be calculated at 4%.

Secondly, there is the question whether Tiedemann's obligation to pay the maintenance and cure of her injured seamen is extinguished by the fact that she was permitted to limit her liability upon the payment into Court of a fund totaling some $179,000. If not, Tiedemann would be liable for approximately $166,000 (the sum of the maintenance and cure claims) in addition to the limitation fund paid into Court just mentioned.

There is a paucity of law on this important question. In Dryden v. Ocean Accident & Guarantee Corp., Ltd., 138 F.2d 291 (7 Cir. 1947) an insurance com-

---

1. There is no evidence that the services rendered were ever anything but delivery of fuels of various grades for defense purposes.

2. While the record is silent on the point, the inference is inescapable that this jet aviation fuel was being delivered for use by the United States Navy Air Force.

In the first place, the first jet plane to be used commercially in the United States was delivered to a commercial airline on August 16, 1958 (Kane's Famous First Facts) and, in any event, it was the duty of claimants' proctor to establish the fact that the fuel was for non-military consumption if he wished to rely on it.

pany insured an employer of seamen against all liability imposed by law but, in a subsequent condition of the policy, purported to exclude any obligation arising *inter alia* from maintenance and cure. The Seventh Circuit Court of Appeals, in denying the right of the insurer to exclude liability for maintenance and cure said:

"Concededly an employee-employer relationship is a contractual one. Probably many of the details of that relationship—wages, hours, etc., are fixed by specific contract provisions and are express contractual rights. But the right here sought to be enforced by the seaman was not founded on a 'meeting of the minds'—it was inexorably attached by ancient and established maritime *law* to every seaman's contract of employment. The parties had no choice in the matter. It was a duty superimposed by *law* coincidental with the formation of the contractual relation. The seaman could not contract against it—his or his employer's will is powerless to destroy it. This aspect alone reflects the true nature of the right here sought to be enforced. It is a right which the maritime law, in the wisdom of experience, found necessary and just, for the complete protection of seamen, whom maritime law has treated as 'wards of admiralty.'

"Both parties have cited the clarifying and exhaustive opinion of Justice Cardozo in Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 174, 77 L.Ed. 368, for support of their respective positions. We feel the discussion there forecloses any doubt as to the source of the employer's duty to the seaman for 'maintenance and cure' as being a right whose source arises in *law,* although applicable only to persons standing in the contractual relation of seaman and employer.

"Justice Cardozo stated: 'The duty * * * [to provide the sea-man with maintenance and cure] *is imposed by the law itself* as one annexed to the employment.' The later case of Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 527, 58 S.Ct. 651, 653, 82 L.Ed. 993, calls the liability for maintenance and cure the *'ancient duty* of a vessel,' and the case of O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 41, 63 S.Ct. 488, 491, 87 L.Ed. [596]—, states, 'From its dawn, the maritime law has recognized the seaman's right to maintenance and cure for injuries suffered in the course of his service to his vessel, * * *.' See also Loverich v. Warner Co., 3 Cir., 118 F.2d 690, 692, for a statement similar to that in the Cortes case."

Id. at 293 (footnote omitted).

The above quoted language, while not decisive of this point, defines the nature of the duty of the employer as respects maintenance and cure. In addition it is significant that the duty exists irrespective of fault or negligence of the employer. See Aguilar v. Standard Oil Co., 318 U.S. 724, 736–737, 63 S.Ct. 930, 87 L.Ed. 1107 (1943); The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903). Needless to say, the duty is a unique one and quite different from duty to make reparation for personal injuries. Congress cannot be presumed to have created the possibility that this duty can be wiped out. If maintenance and cure is subject to limitation, a seaman's protection under this ancient right might be seriously diminished in some circumstances. Therefore, despite the broad language of the Limitation of Liability Statute, 46 U.S.C. § 183, I hold, upon principle, that such a liability is not one which is extinguished by the granting of a petition to limit liability. Strongly persuasive, although not on point, is Seely v. City of New York, 24 F.2d 412 (2 Cir. 1928). This was also the result reached by Judge Murphy in Murray v. New York Central Railroad Co., 171 F.

Supp. 80 (S.D.N.Y.1959),[3] a decision squarely on point which, in the absence of authority to the contrary, I shall follow.

Nor, as argued by proctor for Tiedemann, do I believe that the entry of the final decree of this Court dated April 16, 1962, extinguished Tiedemann's liability. This self-styled "Final Decree" actually related only to the main question of negligence and limitation of liability reviewed by the Third Circuit Court in 289 F.2d 237 (1961). In fact, the Commissioner was still in the process of holding hearings on claims when the "Final Decree" of April 16, 1962, was entered so that decree could not have been final in fact.

To what extent, if any, Tiedemann may have a right of contribution[4] against the United States insofar as concerns the Elna awards for maintenance and cure is a question not directly raised. It will have to be decided along with a number of minor matters[5] at the entry of the final decree.

The last matter for consideration concerns a payment of $5,000 to Allen's estate under a policy of War Risk insurance. The United States takes the position that this sum should be deducted by way of a set-off against the amount awarded Allen's widow by the Commissioner. The proctor for claimants makes no argument in his brief on this point, merely contenting himself with the statement that if the United States is entitled to a set-off or credit, the Elna fund is not entitled to a similar credit.

Generally, the law is that a tort feasor is not entitled to any credit by way of a reduction of damage because the injured plaintiff has received the benefit of insurance. 25 C.J.S. Damages § 99. Overland Const. Co. v. Sydnor, 70 F.2d 338 (6 Cir. 1934). And, more particularly, in an analogous situation involving the Employers' Liability Act, a defendant railroad was not entitled to deduct from its injured employee's award for permanent injuries the amount of an annuity received by such injured employee under The Railroad Retirement Act. Hetrick v. Reading Co., 39 F.Supp. 22 (D.N.J.1941). See also United States v. Brooks, 176 F.2d 482 (4 Cir. 1949) where, although not an Admiralty case, the United States was, as here, both the insurer and liable as a defendant.

Finally, the War Risk Insurance Act itself provides:

"§ 1290. Seamen's rights unaffected. This subchapter shall not affect rights of seamen under existing law."[6]

46 U.S.C. § 1290.

It is my conclusion then, in the absence of any assistance from counsel on the point, that the exception by the United States must be overruled with the result that it is not entitled to have the amount of war risk insurance paid to Allen's widow set off against the Commissioner's award. This being so, the contention by claimants' proctor that the Elna fund is not entitled to a credit becomes moot.

To the extent that Findings of Fact are necessary, this opinion shall be taken as constituting Findings of Fact.

---

3. My rationale is somewhat different than that of Judge Murphy. He held that maintenance and cure was an exception within the statute, whereas I am holding that it is not included in the statute.

4. See Seely v. City of New York, supra. Compare Jones v. Waterman S.S. Corp., 155 F.2d 992 (3d Cir.).

5. (1) Recomputation of Allen claim (2) the restoration of income tax deductions erroneously made by the Commissioner in certain claims (3) recomputation of the Reneau claim with respect to the deduction of fractional shares.

6. I assume the policy of insurance in question contained no clause to the effect that amounts paid out to injured or deceased insureds should be credited against awards for injuries or death. Otherwise the United States would have introduced the language of the policy while litigating the Allen claims before the Commissioner.