436 F.2d 1256
 Petition of UNITED STATES STEEL CORPORATION and Petition of
Den Norske Amerikalinje A/S owner of the M/S
Topdalsfjord, for Exoneration from or
Limitation of Liability. UNITED STATES STEEL CORPORATION and
Den Norske Amerikalinje A/S, Appellants,
v.
Alice Marie LAMP, Administratrix of the Estate of Donald
Lamp, Deceased, etal., Appellees.
 Nos. 19835-19839.
 United States Court of Appeals, Sixth Circuit.
 Dec. 23, 1970.
 
 Lucian Y. Ray, Cleveland, Ohio, Joseph Keig, Jr., Chicago, Ill. (Roman T. Keenen, Lucian Y. Ray, Thomas O. Murphy, Cleveland, Ohio, Johathan G. G. Bunge, Chicago, Ill., on the brief, for United States Steel Corporation and Den Norske Amerikalinje; McCreary, Ray & Robinson, Cleveland, Ohio, Price, Cushman, Keck & Mahin, Chicago, Ill., Johnson, Branard & Jaeger, Cleveland, Ohio, of counsel.
 Abraham E. Freedman, Philadelphia, Pa. (Freedman, Borowsky & Lorry, Philadelphia, Pa., T. Harold Traverse, Cleveland, Ohio, on the brief), for Fuhrman and others.
 Ned Mann, Cleveland, Ohio (Victor G. Hanson, Detroit, Mich., Robert L. Jason, Alpena, Mich., on the brief), for Alice Marie Lamp.
 Dean A. Robb, Detroit, Mich. (Elmer L. Radka, Rogers City, Mich., Goodman, Eden, Robb, Millender, Goodman & Bedrosian, Deal A. Robb, Charles J. Barr, Detroit, Mich., on the brief), for Jean A. Cook.
 Before PHILLIPS, Chief Judge, and WEICK and PECK, Circuit Judges.
 JOHN W. PECK, Circuit Judge.
 
 
 1
 There are herein considered appeals perfected by two shipowners from judgments entered against them in favor of twelve injured parties or personal representatives of decedents and cross appeals by the latter groups protesting the alleged inadequacy of those judgments. Appellants will sometimes herein be referred to jointly as 'Shipowners' and separately as 'United States Steel' and 'Den Norske', respectively, and the injured parties and personal representatives of decedents as 'Claimants.' Claimants are seven seamen and five widows and administratrices of the estates of seamen who were allegedly injured or who lost their lives when the bulk carrier steamship Cedarville sunk in the Straits of Mackinac May 7, 1965. All such decedents and surviving claimants were members of the crew of that vessel.
 
 
 2
 The sinking of the Cedarville, owned by United States Steel, followed its collision with the Norwegian ship Topdalsfjord, owned by Den Norske. The collision occurred in a dense fog, and ten members of the Cedarville crew were lost and twenty more sustained injuries which resulted in the filing of claims. Five of the death claims and thirteen of the personal injury claims were settled during earlier stages of these proceedings, and we are here concerned with the remaining five claims of the next of kin of the decedents and of seven personal injury claimants. Petitions for exoneration from or limitation of liability were filed in the District Court[1] immediately following the disaster, followed by the filing of claims by the various claimants. Reference is made to the opinion of the District Court (276 F.Supp. 163) for a detailed statement of the facts,[2] which will be restated herein only to the extent required for present purposes. Punitive damages were awarded by the District Court against United States Steel, which perfected an appeal from such award to this Court. We determined the award of punitive damages to have been error in a decision specifically providing that that determination would have no effect upon the awarding of compensatory damages to the various claimants. United States Steel Corporation v. Fuhrman, Administratrix, 407 F.2d 1143 (6 Cir., 1969), cert. denied 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970).
 
 
 3
 During the pendency of the punitive damages proceedings and appeal, a stipulation was entered into by counsel for all parties and approved by the Court. Under this stipulation the shipowners' petitions for exoneration and limitation of liability were denied and their claims dismissed with prejudice, and it was further provided that, subject to the right of review and appeal, the disposition of all claims for damages, excluding punitive damages, be determined by a commissioner to be appointed by the District Court. It was further stipulated that hearings concerning compensatory damages should proceed during the pendency of the punitive damage determination, which were to be submitted on stipulated portions of the record. As has been hereinabove indicated, the punitive damage issue has heretofore proceeded to finality.
 
 
 4
 Pursuant to this stipulation, the District Court appointed two Commissioners to receive the evidence with reference to all of the claims, and they in due course filed their Awards and Opinions for the various claimants. The District Court thereafter received and overruled objections and requests for modifications and accepted the facts found and law applied by the Commissioners in their awards and opinions 'as the findings of fact and rules of law of this Court.' By separate document of even date judgments in favor of the individual claimants for specified sums were entered and costs were assessed against the Shipowners. The amounts of the judgments are as follows:
 
 
 5
 Alice Marie Lamp, Administratrix of
 the Estate of Frank Donald Lamp,
 deceased $452,084.00
Jean Cook, Administratrix of the
 Estate of Charles H. Cook, deceased 194,491.00
Barbara Fuhrman, Administratrix of
 the Estate of Arthur Fuhrman,
 deceased 338,095.00
Elizabeth Haske, Administratrix of the
 Estate of Stanley Haske, deceased 308,702.00
Marion B. Jones, Administratrix of the
 Estate of Eugene F. Jones, deceased 149,414.00
Jerone F. Kierzek 88,860.00
Stanley P. Mulka 92,740,00
Raphael Przybyla 196,288.00
Ronald G. Piechan 82,160.00
Billy R. Holley 251,976.00
Michael John Idalski 89,420.00
Walter Tulgetske 195,888.00
 
 
 6
 Before passing to a consideration of the separate items of damages itemized by the Commissioners in their determination of the claimants' awards, attention is directed to the issue presented concerning the scope of the present review. This issue was before us in the appeal dealing with the question of the allowance of punitive damages in the present case and we therein determined that 'Rule 52(a) applies to the findings of fact of the District Judge * * * notwithstanding that he heard no live testimony at the trial. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.' United States Steel Corp. v. Fuhrman, Administratrix, supra; see also Commissioner of Internal Revenue v. Spermacet Whaling & Shipping Co., 281 F.2d 646 (6th Cir. 1960). Thus at the very least, despite the view expressed in the separate concurrence in Fuhrman that the determination expressed therein on this point and in Spermacet constituted obiter dictum, the quoted conclusion is here controlling as the law of the case. Accordingly, we are here required to affirm the District Court unless we conclude its finding to have been 'clearly erroneous' under the definition provided by the Supreme Court:
 
 
 7
 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum, supra, 333 U.S. at 395, 68 S.Ct. at 542.
 
 
 8
 It is against this yardstick that we measure the evidence of compensatory damages contained in the record.
 
 I. PERSONAL INJURY CLAIMS
 
 9
 For their experiences at the time of the sinking, and for their alleged physical and mental disabilities resulting therefrom, the seven personal injury claimants were awarded a total of $997,332. The individual awards ranged from $82,160 to $251,976, and included the following specific elements of damages: loss of earning capacity from the date of the accident to the date of judgment, and for future loss of earning capacity; pain and suffering experienced during the sinking, from the date of the sinking to the date of judgment, and for future pain and suffering; loss of life's pleasures from the date of the sinking to judgment, as well as future loss of life's pleasures; maintenance and cure to the date of judgment; and the cost of future medical services.
 
 
 10
 Before turning to a discussion of the specific elements of damages awarded to the personal injury claimants, a few comments of a general nature are deemed appropriate.
 
 
 11
 The first pertains to the nature of the Commissioners' Opinions and Awards themselves. Those Opinions and Awards, although designated by the Commissioners as their findings of fact and conclusions of law, are entirely unsatisfactory in that respect. Despite the fact that these cases present difficult and complex issues of past and future damages, depending in large part on conflicting medical and psychiatric testimony, the Opinion and Awards for each individual claimant consisted only of a brief review of that testimony together with the claimant's testimony, and concluded with a bare conclusory finding such as:
 
 
 12
 'We determine that the claimant Idalski was injured on May 7, 1965 and was damaged thereby.'
 
 
 13
 In each instance a statement of this nature is followed by a listing of the dollar amounts awarded for each of the elements of damages allowed to the individual claimants.
 
 
 14
 We recognize that this abbreviated aspect of the Commissioners' findings here would not alone be sufficient to require reversal, especially since the findings were concerned with the question of damages rather than liability. Compare Ginsberg v. Royal Insurance Company, 179 F.2d 152, 153 (5th Cir. 1950) with Matton Oil Transfer Corporation v. The Dynamic, 123 F.2d 999, 1000-1001 (2d Cir. 1941). But such findings are of little aid to intelligent appellate review. The appellate court is left to presume that the Commissioners accepted the claimants' evidence and based their awards on some combination thereof, but if some of that evidence is found upon review to have been incompetent, the court can only speculate as to the degree to which such evidence influenced the Commissioners.
 
 
 15
 The next comment is less general in nature, but it pertains to a threshold issue common to each of the personal injury claims. To a very large extent the awards assigned to the various elements of damages were grounded upon the testimony of claimants' psychiatric and orthopedic experts. With particular reference to claimants' psychiatric expert, shipowners argue that he was a part of a 'circle of advocacy' otherwise composed of the claimants and their attorneys, and that his testimony should be discredited as it was by the Commissioner in the Matter of Petition of Keystone Tankship Corp. and Keystone Shipping Co., In Admiralty, No. 16,994, United States District Court for the Western District of Washington, Northern Division (the Bunkerhill) (237 F.Supp. 689). Were we sitting as the triers of fact, or were we not required by the law of the case as established in United States Steel Corporation v. Fuhrman, Administratrix, supra, to follow the rule of Gypsum, the inclination to so discredit his testimony would be strong upon us. In the existing circumstances, however, we are required to accept that testimony unless we possess 'on the entire evidence * * * the definite and firm conviction that a mistake has been committed,' or unless we conclude his pertinent testimony was inadmissible in the premises and improperly received in evidence.
 
 
 16
 Considering the credibility issue first, we find before us a record in which virtually all of the objective evidence is inconsistent with, if not actually diametrically opposed to, the opinions which the psychiatric expert was permitted to place in the record. These opinions are of a curiously similar pattern with reference to each of the personal injury claimants, almost always concluding that each seaman suffered indescribable horrors and has had his future life warped by a 'post-traumatic anxiety neurosis'-- resulting from a half hour's immersion in the waters over which they traveled for a livelihood. These opinions were based almost exclusively on interviews conducted for the purpose of preparing testimony for presentation to the Commissioners. In many respects these expert opinions failed to take into account such circumstances as pre-accident complaints and medical treatment for some of the conditions thereafter existing, and in connection with the dire prognostications do not recognize post-accident promotions and actual increases in earnings, nor satisfactory home and occupational adjustments.
 
 
 17
 An illustrative example is that of claimant Stanley Mulka. Mulka was sailing for the first time on the trip which culminated in the sinking of the Cedarville. Prior to sailing he had attended four years of high school and the first year of college at a Roman Catholic seminary, studying for the priesthood. He then had doubts about continued study for the priesthood, and these doubts apparently caused academic problems. He left college on academic probation early in 1965.
 
 
 18
 After the sinking Mulka abandoned his short-lived sailing career. He worked the remainder of the summer of 1965 as a plumber's helper and returned to college in the fall of 1965. Upon his return to college, he embarked on a course of study to prepare him to be a school teacher. His grades showed a marked improvement after his return to college, almost all A's and B's and he received an excellent rating as a student teacher. At the time of the hearing below Mulka was set to graduate from college, and he was virtually assured of a position as a teacher. In addition to his participation in normal college social life such as fraternities and special interest clubs, he had a steady girl friend and indicated plans of marriage.
 
 
 19
 Although Mulka testified that he suffered from constant headaches since the date of the accident and that he also suffered constant, sometimes excruciating, pain in his back, arms and hands since the date of the accident, cross-examination disclosed that he had sought medical attention for headaches prior to the sinking as well as after, but that he had not bothered to seek medical treatment for the 'excruciating' pain in his back, arms or hands since the date of the accident.
 
 
 20
 Claimants' psychiatrist, testifying solely on the basis of the history and symptoms related to him by Mulka, stated that he found Mulka to have deteriorated emotionally and scholastically after the date of the accident. He diagnosed his condition as a 'moderately severe anxiety neurosis' which would prevent Mulka from maintaining a job as a school teacher and would disable him to some extent in any occupation he undertook. Cross-examination disclosed to the psychiatrist for the first time many significant facts such as Mulka's academic improvement upon his return to college after the sinking, his excellent rating as a student teacher, and the fact that he had sought medical attention for serious headaches prior to the sinking, but the doctor saw no need to change his diagnosis.
 
 
 21
 Such factors form the basis for our dissatisfaction with this testimony, and applying the test of Gypsum, on the basis of the entire evidence, we express a definite and firm conviction that a mistake has been committed. However, we do not reject this testimony on this ground alone.
 
 
 22
 The rules under which doctors (as well as other experts) are permitted, as an exception to the general rule, to express opinions have been carefully formulated. The most important of those rules for present purposes is that a medical opinion based upon the history and subjective symptoms related to a doctor solely for the purpose of enabling him to testify at trial is inadmissible. Nashville, C. & St. L. Ry. v. York, 127 F.2d 606, 611-612 (6th Cir. 1942); Hardy-Burlingham Mining Co. v. Baker, 10 F.2d 277, 281 (6th Cir. 1926); Baltimore & O.R.R. v. Mangus, 294 F. 761, 762 (6th Cir. 1924). See Padgett v. Southern Ry., 396 F.2d 303, 308 (6th Cir. 1968). Shipowners contend that since the remarkably similar diagnoses of each claimant's alleged psychiatric disturbance were based solely on the medical history and subjective symptoms related to the psychiatrist by the claimants in order to qualify him to testify in their behalf, that opinion testimony was inadmissible.
 
 
 23
 Claimants do not challenge the correctness of this rule as it applies generally to the diagnosis of physical complaints, nor do they challenge the shipowners' assertion that the psychiatric diagnosis common to each claimant was based on the history and subjective complaints related to the doctor to qualify him to testify at trial. Rather, they claim an exemption from the general rule, arguing that the diagnosis of psychic disturbances requires the evaluation of the patient's history and subjective complaints. Indeed, claimants contend that the history, subjective symptoms, attitudes and feelings elicited by the psychiatrist from his patient are the only bases for an evaluation and diagnosis of a psychiatric disturbance.
 
 
 24
 Whatever persuasive effect this argument might have is vitiated by the fact that it finds no support in the record, and certainly the bases for psychiatric diagnosis cannot be judicially noticed. If it is true that psychiatric evaluation must be based in large extent on subjective evidence, the time may come when a separate rule of law will evolve establishing different admissibility standards for opinions as to mental and physical disorders (or the absence thereof). However, if such a distinction is ever to be made, it must be on the basis of evidence justifying a different standard, which in turn must be established by the testimony of experts. No such testimony is contained in the present record,[3] and we will not substitute our lay judgment in this peculiarly nebulous field for evidence.
 
 
 25
 Even were we to accept the claimants' argument in this regard, it would meet only one of the reasons underlying the general rule outlined above, that of the objectionable hearsay nature of the doctor's narration of his patient's history and subjective complaints upon which his opinion was based. A separate but related policy reason for the rule is the exclusion of medical opinion testimony based on what may well be the self-serving declarations of the plaintiff to the examining doctor. See Padgett v. Southern Ry., supra. Where the plaintiff consults a doctor solely to qualify him to testify in his behalf at trial, any statements made to the doctor must be highly suspect as a basis for a diagnosis. This is particularly true where, as here, the complaint is entirely subjective, the plaintiff has made no attempt to secure treatment for the complaint, and there is at least some divergence between the history and symptoms related to the doctor and those testified to under oath. Accordingly, we hold the psychiatric opinion testimony to have been improperly admitted in this case.
 
 
 26
 A somewhat different situation exists with respect to medical opinion testimony of physical impairment. Five of the personal injury claimants, Holley, Idalski, Piechan, Przybyla and Tulgetske, offered the testimony of an orthopedic expert, who, like the claimants' psychiatric expert, was consulted by claimants solely for the purpose of enabling him to testify in their behalf at the hearing. At the outset of his testimony ship owners renewed their objection to the admission of any expert opinion testimony based upon the history related to the doctor by the claimant. Without explaining their inconsistent rulings, the Commissioners correctly ruled that the orthopedic expert would not be permitted to testify to the history given him by the claimants. In accordance with this ruling the orthopedist then testified to the symptoms observed by him during the examination of each claimant and stated his diagnosis of their various physical ailments based upon such observations. However, despite the ruling immediately prior thereto, with respect to the question of causation of the physical ailments he had diagnosed, the doctor was permitted to state that in his opinion they were caused by 'an incident of May 7, 1965.'
 
 
 27
 The admission of this opinion testimony of causation was error. Nothing in the record discloses the basis for the doctor's opinion as to causation other than the history related to him by the claimants in the course of their examination. As stated above, the opinion of an examining physician based upon the history related to him by the plaintiff is inadmissible. Nashville, C. & St. L. Ry. v. York, supra; Hardy-Burlingham Mining Co. v. Baker, supra; Baltimore & O.R.R. v. Mangus, supra; Padgett v. Southern Ry., supra. However, the admission of this testimony was not fatal to the claimant's claims of physical impairment resulting from the sinking. In Sentilles v. Inter-Caribbean Shipping Co., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), the Supreme Court held that the failure of any medical expert to testify that an accident aboard ship was the cause of a seaman's subsequent tubercular condition did not prevent the trier of the fact from inferring that the accident aboard ship was the cause. 361 U.S. at 109, 80 S.Ct. 173. We believe the erroneous admission of the opinion testimony of causation here creates a record in this case similar to that in Sentilles: no competent medical evidence of causation but sufficient evidence from which the Commissioners could infer that the physical disabilities diagnosed were caused by the sinking of the Cedarville.
 
 
 28
 In summary, with respect to the expert opinion testimony offered below in support of the claimants' allegations of physical and psychiatric disabilities, we are presented with a record which contains no competent evidence of psychiatric disturbances or disabilities but which does contain competent evidence of physical disabilities along with other evidence from which the Commissioners could properly infer a causal connection with the sinking of the Cedarville. It is with these principles in mind that we turn to a discussion of the individual elements of damages awarded by the Commissioners.
 
 
 29
 a. Pain and Suffering.
 
 
 30
 The most constant item in the Commissioners' awards is, as it is described therein, 'Pain and suffering for the May 7th event.' Four of the claimants were awarded $15,000 each for this item, while two (Idalski and Tulgetske) were allowed $10,000 each and one (Holley) was awarded $20,000. As has been indicated above, the Commissioners' Opinions and Awards disclose little of the basis for such awards. Under the general caption 'Pain and Suffering' they offer one lengthy but inappropriate quotation from American Law Reports but otherwise give no indication of the guidelines used in making their determination. Moreover, while Holley's situation is clearly distinguishable, it is difficult, if not impossible, to ascertain from the Commissioners' description of the experiences of the individual claimants during the sinking just what formed the basis for distinguishing Idalski's and Tulgetske's situation from those of the other four.[4]
 
 
 31
 The seven personal injury claimants were variously engaged at the moment of the collision of the Cedarville and the Topdalsfjord. Some were standing their regular watch; some were sleeping and were awakened by the noise and impact of the collision. However, all of the surviving claimants described the impact as relatively 'soft,' and none were injured by the impact of the collision itself. There then followed a period of time during which, despite the action of the crew members to halt it, the flow of water into the Cedarville rapidly increased. It therefore soon became apparent to the crew members that the Cedarville was going to sink and that it must be abandoned. In the resulting rush of events most of the crewmen were either thrown or required to jump into the water. They remained there for periods ranging from a few minutes to thirty to forty minutes before being picked up by their rescuers, but while in the water most were able to find their way to a life raft or a life boat within a matter of minutes.
 
 
 32
 A German ship, the Weissenburg, had been following the Topdalsfjord at a distance of about one mile, and its captain had 'seen' the collision on his radar screen. The Weissenburg immediately moved into position to pick up the Cedarville crew, and, within the thirty to forty minute time period referred to above, all of the survivors had been taken aboard the Weissenburg. They were there given blankets, dry clothes and warm drinks. Soon thereafter they were transferred to the Coast Guard Cutter Mackinac, aboard which they went to Mackinac City, Michigan, and thence to Cheboygan, Michigan. With but one exception all of the survivors were taken to the Cheboygan Hospital for examination; Mr. Piechan declined to go to the hospital.
 
 
 33
 Following examination, none of the claimants were found to require hospitalization, and all were returned to their homes the same afternoon. Claimant Holley, complaining of back pains, returned to the hospital that evening, however. He stayed there one night, underwent further examination, including x-rays, with negative results, and was released by the hospital the following day.
 
 
 34
 In spite of what can only be regarded as deficiencies in the disclosure of the basis for the Commissioners' Opinions and Awards, the awards to the individual claimants might be sustained on the basis of their individual testimony describing their personal experiences at the time of the sinking except for two factors. First, we regard the awards for pain and suffering on the occasion of the sinking as excessive. Second, we are clearly unable to conclude that the inadmissible but colorful testimony of the highly articulate psychiatric expert was not persuasive with the Commissioners. We thus have no alternative but to vacate these awards and to remand them for reevaluation and further findings on the basis of the present record exclusive of the incompetent psychiatric testimony.
 
 
 35
 Intervening chronologically between the pain and suffering items 'For the May 7th event' and those for the future are the pain and suffering damages allowed for the four-year period from the sinking to the date of the District Court judgment, May 7, 1969. An award in the sum of $10,000 (on the basis of $2,500 per year) was allowed on this account to each of the claimants except for Idalski, who received a $12,000 award (on a $3,000 per year basis).
 
 
 36
 As in the case of the pain and suffering allowance 'For the May 7th event', the Commissioners' Awards and Opinions set forth no satisfactory basis for the determination of these interim period awards (except that again Holley's situation is distinguishable and in Idalski's case, perhaps to justify the higher award made to him, passing mention is made of pains in the left leg, shoulder, shin and elbow area). However, also as in the case of the 'For the May 7th event' awards, the fact remains that although there is some evidence in the record as to the claimants' discomfort for a past period, we conclude the amount of the awards to be excessive, and we are unable to say that the inadmissible testimony of the psychiatric expert was not a factor in the determination thereof. Thus these awards must also be vacated and remanded for further findings and reevaluation without such testimony.
 
 
 37
 The awards for future pain and suffering, which ranged from $5,000 to Mulka (50 years, his life expectancy, at $100 per year) to $35,200 to Tulgetske (10 years at $2,000 per year and 15.2 years at $1,000 per year, for a life expectancy of 25.2 years), present a similar picture. While the basis of the Commissioners' awards for pain and suffering experienced during the events surrounding the sinking and until the date of judgment is less than satisfactory, the direct evidence from the claimants themselves provides some support for the awards. An award of damages for future pain and suffering cannot rest solely on the evidence of past pain and suffering, however. Competent medical testimony showing both diagnosis and prognosis is necessary before the trier of fact can reasonably find that pain and suffering will continue into the future.
 
 
 38
 As indicated above, all of the claimants here offered expert psychiatric testimony in support of their alleged future pain and suffering, and all but two of the claimants (Mulka and Kierzek) offered expert orthopedic testimony as additional support. Since we have already held, however, that the expert psychiatric testimony was improperly admitted into evidence and can provide no basis for any of the awards, to the extent that any award was based on such expert psychiatric testimony, it must fail. Accordingly, the awards to Mulka and Kierzek, being based solely on the incompetent psychiatric testimony, must fail completely. The awards to the other five claimants must fail in part also since it is clear that they were based in part on the incompetent psychiatric testimony. However, since, as has also been stated, it is impossible to discern from the Commissioners' Opinions and Awards the extent to which those awards were grounded upon the incompetent evidence, we again refuse to substitute our judgment for that of the Commissioners and instead vacate the awards and remand for further findings and reevaluation solely on the basis of the evidence here held to be competent.
 
 
 39
 b. Loss of Life's Pleasures.
 
 
 40
 The next category of awards, those for loss of life's pleasures, is closely related to the awards for pain and suffering in that evidence offered to support a claim for loss of life's pleasures generally parallels that required to support a claim for pain and suffering. Awards in this category have on occasion been made by courts to claimants who, by reason of their injury, are deprived of the opportunity to participate in the normal activities, social, athletic or recreational, in which a person without such injury could engage. See e.g., Hanson v. Reiss Steamship Company, 184 F.Supp. 545 (D.Del.1960); Vastano v. Partownership Brovigtank, 158 F.Supp. 477 (E.D.N.Y.1957); Yates v. Dann, 124 F.Supp. 125 (D.Del.1954).
 
 
 41
 The Commissioners made awards in this category to each of the personal injury claimants ranging from $3,500 (to Mulka) to $65,200 (to Tulgetske). Here again the awards present the recurrent problem hampering appropriate appellate review in this case-- the virtual absence of any indication from the Commissioners of their basis for the awards. To some extent the awards may have been based on the testimony of the claimants as to their inability to engage in certain activities since the date of the accident, but a study of the record precludes any conclusion but that the awards were also based in large part upon the diagnosis offered by claimants' psychiatric expert as to each claimant of a post-traumatic anxiety neurosis.
 
 
 42
 An illustrative example is that of claimant Jerome Kierzek. The only item in his testimony remotely connected to any impairment of his ability to enjoy the pleasures of life was his own testimony on direct examination that, following the sinking of the Cedarville, he acquired a fear of sailing which caused him to engage in heavy drinking. While it is doubtful that such testimony could be considered a proper basis for an award, even that basis is destroyed by his own testimony on cross-examination, which established that his drinking subsided shortly after his marriage a few months after the sinking. The remainder of his testimony provides no support for finding any reduction in any of his activities, social or recreational, or any domestic difficulties which could in any way be related to the sinking. To the contrary, Kierzek's testimony showed, among other things, that he loved his wife and child, that he got along well with them, that he enjoyed going out socially with his wife (although his opportunity to do so was severely limited during his two years overseas duty in the U.S. Army), and that he had received five promotions during the course of his two year tour of army duty. Moreover, as stated above, Kierzek offered no expert medical opinion testimony of any physical disability caused by the sinking which would impair his ability to engage in the normal activities of a man of his age and situation. The only testimony in the record which even approximates a basis for the Commissioners' award to Kierzek for loss of life's pleasures appears in the incompetent as well as incredible testimony of the claimants' psychiatric expert:
 
 
 43
 'Q. Will (this anxiety neurosis) affect his life's pleasures? A. Yes, sir.
 
 
 44
 'Q. In what respect? A. In that certainly, he cannot have the usual, normal pursuit of happiness that all of us, I believe, are entitled to.
 
 
 45
 'Mr. Keig: I would like to strike that conclusory statement. There is not one factual thing in that.
 
 
 46
 'The Commissioner: I was listening for something factual, too.
 
 
 47
 'Maybe he could give something factual as to how he is going to be denied life's pleasures.
 
 
 48
 'Q. Will you answer that question, Doctor? A. Yes, sir. I don't believe that he would get the pleasure out of being with people that other people do. I don't believe that he is able to enjoy the pleasures of, say, going to a movie, bowling, organizations that many men are accustomed to. I believe that he will not be as happy in his marriage as he would be without his anxiety neurosis.'
 
 
 49
 As with the awards for pain and suffering, without the incompetent psychiatric opinion testimony as support, the awards for loss of life's pleasures are so grossly excessive as to be clearly erroneous. To the extent that any of the awards for loss of life's pleasures were based on the psychiatric testimony hereinabove held inadmissible, the awards must fail. A determination, however, of the validity of the awards in this group other than that to Kierzek requires a sifting and weighing of the evidence, a function more suited to the fact finder than to this court. Accordingly, we again vacate and remand for further findings and reevaluation, on the basis of the present record exclusive of the incompetent psychiatric testimony, the awards for loss of life's pleasures to each of the personal injury claimants other than Kierzek. We hold that the award to him on this account is not supported by the record as a matter of law.
 
 
 50
 c. Loss of Earning Capacity.
 
 
 51
 Two items of damages allowed to each of the personal injury claimants were for loss of earning capacity for the four year period from incident to judgment, and for the future, respectively. The awards made for the four year period may first be summarily disallowed. The Commissioners preface their determination of these awards with the abstruse statement, 'The loss of earning capacity of the surviving seamen is measured by reasonable probability based upon evidence which permits the decision-maker to arrive at a pecuniary value of the loss.' They then offer a resume of principles suggested as available for guidance in the determination of such loss, but like the quoted statement, they are without present application because the record is utterly void of evidence which would thereunder justify an award to any of the present claimants. While this further circumstance would not necessarily be fatal to the claims, the fact is that the record establishes that with the exception of Mulka who returned to college shortly after the sinking and Kierzek who entered the Army in March 1966, both of which circumstances were unrelated to the sinking, each of the claimants was compensated on a higher basis during the four year period than that under which he had been receiving compensation either immediately prior to the sinking or for the four-year period immediately prior thereto. The formula for determining the amount of an award for loss of earning capacity in this Circuit was enunciated in Imperial Oil, Ltd. v. Drlik, 234 F.2d 4, 11 (6th Cir. 1956):
 
 
 52
 'One who is injured in his person by the wrongful act of another may recover loss of time resulting therefrom and consequent loss of earnings, including future earnings, provided they are shown with reasonable certainty and are not merely speculative in character. The measure of damages in this field is fairly definite, and the amount awarded is controlled by what the evidence shows concerning the earning capacity of the injured person before and after the accident.'
 
 
 53
 The Commissioners, and thus the District Court which adopted their conclusions without independent elaboration, simply ignore this teaching of Drlik without reference thereto. Similarly, although the application of Drlik is argued in shipowners' main brief, the answering brief of the personal injury claimants (and of three of the death claimants) makes only a passing comment to another aspect of Drlik.[5]
 
 
 54
 However we express reservations concerning the averaging out period used in Drlik. During one's progress through the working years of life his income normally shows at least some annual increase, with normally no decrease except as may be occasioned by personal or economic adversity until his declining years. For such use as it may be in the remand hereinafter directed, we therefore express the view that the base should be the higher of the year immediately preceding the incident or the average of the four years preceding it, unless the tortfeasor sustains the burden of showing that the single year was high for abnormal reasons. It was for that reason that we earlier observed that these claimants had not shown a decrease in earning capacity for the four year period following the sinking when compared either to earnings immediately prior thereto or to the average of the four previous years,[6] and we restate the disallowance of those awards.
 
 
 55
 The problems faced in connection with future earning capacity are considerably more difficult than those involved in a consideration of earning capacity for a concluded period, as in this case the four years from incident to judgment. Where a past period is involved, in the absence of an affirmative showing to the contrary, the best evidence of earning capacity is the individual's actual earning record. As to the future, the same general principle of comparison of the claimant's earning capacity with and without injury applies. As the Second Circuit has stated:
 
 
 56
 'The objective is to place the (claimant) in the same economic position as would have been his if the injury had not occurred. We seek to accomplish this goal by a formula which, stated in an oversimplified form, consists of determining what (claimant's) annual earning power would have been but for the injury, deducting what it will be thereafter, multiplying the result by (claimant's) (work life) expectancy, and discounting the product to present value.' Conte v. Flota Mercante Del Estado, 277 F.2d 664, 669 (2d Cir. 1960).
 
 
 57
 While the general formula is easily stated, its application in the evaluation of future earning capacity is less easy. However, again some principles of general application can be stated. The claimant must first establish his normal annual earning capacity, which, in the absence of evidence of special circumstances indicating an ability to rise beyond his prior level of employment, would consist of a projection of claimant's earnings history, taking into account all available data relevant to wage adjustment. Next the claimant must establish the reduction, if any, in his earning capacity proximately resulting from the injury by showing the existence of some condition which demonstrably limits his opportunities for gainful activity. See e.g., Wiles v. New York, C. & St. L.R.R., 283 F.2d 328, 331 (3rd Cir. 1960); Conte v. Flota Mercante Del Estado, supra. We gravely doubt that any such loss can be demonstrated from the record as to any of the present claimants, with the possible exception of Tulgetske and Holley, but once again it is impossible to tell from their Awards and Opinions what factual considerations motivated the Commissioners in this regard, and to what extent the emphatically articulated but inadmissible testimony of the psychiatric expert was persuasive. For this reason the awards made to all of the survivors for loss of future earnings will be vacated and remanded for further findings and reevaluation by the Commissioners.
 
 
 58
 d. Maintenance and Cure.
 
 
 59
 Awards for maintenance and cure to the date of judgment were made by the Commissioners to four of the personal injury claimants: Holley, Idalski, Przybyla and Tulgetske. The awards were calculated at the claimants' contractual rate of $8.00 per day for the 1461 days intervening between the date of the sinking and the date of judgment, less any days for which maintenance and cure had already been paid. Thus the award to each claimant was in excess of $11,000.
 
 
 60
 The principles of law governing an award for maintenance and cure are well settled. The law imposes a duty upon the master and owner of a vessel to provide his seamen with food and lodging if they should become sick or injured while in the ship's service. The duty begins with the inception of the disabling sickness or injury and continues until the seaman reaches maximum medical recovery. Vaughan v. Atkinson, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). Presumably such time would normally be when the seaman voluntarily returns to work. The duty of the shipowner extends beyond the termination of the voyage, Calmar S.S. Corporation v. Taylor, 303 U.S. 525, 528, 58 S.Ct. 651, 82 L.Ed. 993 (1938), and it is not necessarily terminated by the seaman's resumption of some gainful employment if the shipowner has in effect forced the seaman to return to work by willfully ignoring his claim for medical attention. Vaughan v. Atkinson, supra.
 
 
 61
 Under the facts of this case we must conclude the awards to have been improper. As with so many of the other awards for the various elements of damage, it is once again difficult, if not impossible, to determine from the Commissioners' Opinions and Awards their basis for granting maintenance and cure. The itemization of the amounts awarded to the four claimants merely contains a cryptic notation such as:
 
 
 62
 'He has not reached maximum medical recovery and is entitled to maintenance and cure at $8.00 per day for 1461 days.'
 
 
 63
 The record suggests that, at least insofar as some of the claimants are concerned, the award was based on the testimony of claimants' expert psychiatrist who stated that the claimant was in need of psychiatric treatment from the date of the accident to the date of the hearing. Of course, to the extent any of the awards for maintenance and cure were based on the psychiatric opinion testimony, which we have hereinabove held incompetent, they must fail. The validity of the awards need not rest on whether they were based on the incompetent psychiatric testimony, however, because there is no objective evidence that any of the claimants resumed gainful employment for reasons other than their voluntary determination to do so, nor is there any evidence that any of the claimants made any request for medical attention which was wilfully ignored by United States Steel.
 
 
 64
 'A seaman by voluntarily working at his accustomed trade rather than using maintenance and cure to speed his recovery cannot by those tactics enhance the liability of the shipowner any more than the shipowner can be permitted to minimize his liability by refusing to pay and forcing the seaman back to work.' Pyles v. American Trading and Production Corporation, 372 F.2d 611, 619 (5th Cir. 1967).
 
 
 65
 Accordingly the awards to Holley, Idalski, Przybyla and Tulgetske for maintenance and cure to the date of judgment are vacated.
 
 
 66
 e. Future Medical Services.
 
 
 67
 Under the heading 'Cost of Medical Services' the Commissioners awarded to each of the seven personal injury claimants amounts ranging from $1,560 (to Kierzek) to $15,600 (to Przybyla and Holley) for the stated purpose of permitting the claimants to receive weekly or bi-weekly psychiatric treatment at the rate of $30 per treatment, for periods ranging from two to five years.[7] Unlike most of the other awards, the basis for the Commissioners' awards for the cost of future medical services is clear. The award to each personal injury claimant was based upon the statement of claimants' psychiatrist that the individual claimant was in need of psychiatric treatment for the period of time for which the award was made. Accordingly, in light of our holding herein that the testimony of claimants' psychiatric expert was incompetent and improperly admitted into evidence, the awards for future medical services, being based upon that testimony, must be vacated.
 
 
 68
 f. Recapitulation as to Personal Injury Claims.
 
 
 69
 As has been determined in detail above, certain items included in the judgments entered on account of the personal injuries alleged have been determined to have been erroneously included as a matter of law. Items falling in this category are the losses of earning capacity attributed to each of the seven claimants for the four year period from the date of the sinking to that of judgment, maintenance and cure allowed four claimants (Przybyla, Holley, Idalski and Tulgetske) for the four year period, future medical expenses allowed to all seven claimants, loss of future earning capacity allowed to one claimant (Mulka), and for the alleged loss of life's pleasures to one claimant (Kierzek). On the remand hereinafter ordered the District Court is instructed not to allow damages on account of any of these items. On such remand the District Court is further instructed to make further findings and reevaluate every other allowance included in the judgments entered in favor of the various claimants, each of which allowances is specifically disapproved for the reasons hereinabove set forth. Such further findings and reevaluation shall be made on the basis only of the evidence herein held to have been properly received and in accordance with the principles herein enunciated.
 
 II. DEATH CLAIMS
 
 70
 The death claims present somewhat different issues than those which were presented in connection with the personal injury claims. With few exceptions there is no dispute about the personal representatives' entitlement to the various elements of damage necessary to compensate them for the 'deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased.' Cleveland Tankers, Inc. v. Tierney, 169 F.2d 622, 624 (6th Cir. 1948). Rather, the principal issues in the death cases turn upon the appropriate method of computation of those elements of damage in order to most accurately reflect the true value of the pecuniary loss to the decedents' families. The exceptions concern the awards against both United States Steel and Den Norske for pain and suffering undergone by the decedents in connection with the circumstances of their deaths and for the loss of care and guidance to the widows, and the award applicable only against Den Norske for loss of consortium and loss of care and guidance to the adult children under the Michigan Wrongful Death Act. These issues will be separately discussed.
 
 
 71
 a. Loss of Earning Capacity.
 
 
 72
 The primary element of pecuniary loss to the families of the deceased seamen is, of course, the loss of the decedent's earning capacity, both for the interim period between the date of death and the date of judgment and for the remainder of the decedent's work-life expectancy. The basic factor of the lost earning capacity is the monetary wage which the decedent would have earned had he lived, but earning capacity may also include the value of those fringe benefits which would inure to the benefit of the decedent's family had he lived.
 
 
 73
 In determining earning capacity loss from the date of death to the date of judgment, the Commissioners first appropriately looked to the decedents' actual earnings prior to death and selected as a base the highest of each decedent's annual earnings for the five years prior to his death. That base figure was then increased by 4% To 5% Per year for each of the four years between the date of death and the date of judgment, such increases representing the Commissioners' views of the annual wage rate increases which the decedents would have received in each of the years from 1965 to 1969. The Commissioners then added to the total of lost earnings so computed a factor ranging from 15% To 40% Of such earnings for lost fringe benefits, and from the total of such lost wages and fringe benefits the Commissioners deducted a percentage ranging from 10% To 30%, representing the decedent's personal consumption of such earning capacity.
 
 
 74
 The Commissioners' computation of future earning capacity loss was similar in many respects to the computation of such loss for the four year period. The earnings base selected by the Commissioners represented an approximation of their prior estimate of each decedent's earnings for the year of judgment, i.e., 1969. That base was then multiplied by the decedent's work-life expectancy, with deductions for the decedent's personal consumption, and to the total thus reached, the fringe benefit factor of 15% To 40% Was added. A percentage of 2% To 4% Of that total was then added as representing 'personal productivity improvement and general economic growth.'
 
 
 75
 Issues are raised here concerning almost every step in the Commissioners' computations of earning capacity loss. Shipowners contend that the earnings base selected by the Commissioners for both the four year period and for the future was too high, that the Commissioners erred in assuming that the decedents would have received a wage rate increase of 4% To 5% For each year during the four year period and that the factors added in for fringe benefits and for 'personal productivity and general economic growth' were excessive. Shipowners also contend that the Commissioners erred in failing to make an adjustment to the awards for earning capacity losses for the value of social security and life insurance benefits payable upon the deaths of the decedents and by failing to make an adjustment for the impact of future income taxes upon such earning capacity. On the other hand, claimants contend that the deductions from the estimated lost earnings for the decedents' personal consumption was grossly excessive and that the Commissioners erred in computing the awards on the basis of work-life expectancy rather than full life expectancy, arguing that the decedents would have worked for the remainder of their full life expectancy.
 
 
 76
 Turning first to the question of whether the Commissioners erred in refusing to make an adjustment of their determination of earning capacity loss for the impact of social security and insurance benefits, as well as future income taxes, we hold that there was no error in the refusal to make those adjustments.
 
 
 77
 Social security and insurance benefits payable to the widows and minor children surviving the decedents, even though paid for in part by the decedents' employer, do not represent partial payment of the shipowners' liability for the loss to the families of the decedents' earning capacities. Rather, they represent receipt of private or governmental contract rights which became fully executed and payable upon death without regard to the cause of death, and contrary to Shipowners' assertion, refusal to allow an 'offset' for such benefits does not require them to pay twice for the same loss. See United States v. Harue Hayashi, 282 F.2d 599 (9th Cir. 1960). Shipowners' primary basis for their argument in favor of the adjustment is that the receipt of the social security and insurance benefits reduces the pecuniary loss to the survivors occasioned by reason of the deaths. Relying on the general principle of Cleveland Tankers, Inc. v. Tierney, supra, they contend that they are liable only for the pecuniary loss to the deceased seamen's surviving families. However, upon such reasoning any reduction in the pecuniary loss to the widows or children occasioned, for example, by a widow's remarriage or entry into the labor market, could likewise be justified. As the Commissioners concluded, such benefits are irrelevant to the measure of the earning capacity loss suffered by reason of the seamen's deaths for which the shipowners are liable.
 
 
 78
 The question of whether an adjustment for the impact of income taxes upon the award for loss of earning capacity should be made presents separate issues. Obviously, the earnings which the decedents would have received in the future had they lived, which is the theoretical basis for the award, would have had federal and other income taxes deducted, and an initially plausible argument can be made that the true reflection of future earning capacity loss must be preceded by an adjustment to the award for such taxes. However, we do not find that argument persuasive because the impact of such future taxes cannot be predicted with reasonable certainty. The infinite variations of exemptions and deductions coupled with the possibility of changes in the tax structure which could occur over the span of a decedent's life expectancy could materially alter the impact of the income tax, and any adjustment for income tax either with or without consideration of the possibilities for variation must constitute mere speculation on the part of the trier of fact. See McWeeney v. New York, N.H. & H.R.R., 282 F.2d 34 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960); cf. Sleeman v. Chesapeake & Ohio R.R., 414 F.2d 305 (6th Cir. 1969). We therefore adopt the rule that no adjustment for income tax need be made 'at the lower or middle reach of the income scale.' McWeeney v. New York, N.H. & H.R.R., supra; Petition of Marina Mercante Nicaraguense, S.A., 364 F.2d 118 (2d Cir.), cert. denied, Marina Mercante Nicaraguense, S.A. v. McAllister Bros., Inc., 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967) (The El Salvador). We further hold that each of the anticipated future individual incomes involved in this case fall within that range and that the Commissioners' refusal to make an adjustment for income taxes did not constitute error.
 
 
 79
 We turn next to a consideration of the fringe benefits factor by which the Commissioners increased their awards for lost earning capacity by 15 to 40 percent. As in other instances, Shipowners do not dispute the propriety of an award for fringe benefits. Rather they dispute the size of the awards and the Commissioners' failure to specify and evaluate each individual benefit included in the total. However, the record shows that both the Shipowners and the claimants submitted extensive evaluations of each of the fringe benefits which would have been received by the decedents had they lived. The mere fact that the Commissioners converted the parties' evaluations of the benefits to percentages of the decedents' estimated lost wages for purposes of computation does not render the Commissioners' awards subject to attack for lack of specificity. Insofar as the size of the awards is concerned, the record shows that in some cases there is little variation in the parties' evaluations of the fringe benefit losses, and that in no cases are the Commissioners' awards beyond the range suggested by the parties' own evaluations.[8] While we might not have proceeded in the same manner had the initial decision been ours, both the percentages and the method of computation chosen by the Commissioners find support in the record, and it cannot be said that they are clearly erroneous.
 
 
 80
 Lastly we turn to the first element of the Commissioners' computation of earning capacity loss, i.e., the earnings base upon which such computations were made. As stated above, the Commissioners chose as their initial base for computation each decedent's highest annual earnings for the five year period prior to his death. As we have hereinabove indicated in connection with the personal injury claims, however, the base should be the higher of the year immediately preceding the incident or the average of the four years preceding it. We believe the Commissioners' selection of the highest of the decedent's annual earnings for the five years prior to death to have been clearly erroneous. Moreover, after having so selected the initial earnings base, the Commissioners assumed each decedent's gross earnings would have increased by 4% To 5% Per year for each year from the year of death to the year of judgment. The only apparent basis for such assumption on the part of the Commissioners was the testimony of expert actuaries and economists which tended generally to show that all wages tend to increase from 5% To 6% Annually as the result of increased productivity and inflation. However, in making the assumption, the Commissioners apparently ignored the documentary evidence in the record in the form of the collective bargaining agreements under which the decedents would have continued to have been employed had they lived. Those agreements showed that the annual wage increase which the hourly employees would have been entitled to receive in the four years from date of death to the date of judgment approximated 1 1/2% Per annum, not the 4% To 5% Per annum increase found by the Commissioners. Accordingly we hold that the earnings bases for the determination of earning capacity loss for both the four year period and for the future found by the Commissioners to have been clearly erroneous. In all other respects we find no error in the Commissioners' method of computation of earning capacity loss. The awards for earning capacity losses for both the four year period and for the future will be vacated and remanded for reevaluation in accordance with the foregoing.
 
 
 81
 b. Pain and Suffering.
 
 
 82
 As in the personal injury cases, the most constant item in the Commissioners' awards in the death cases was the award of $5,000 to each claimant for the pain and suffering undergone by each decedent prior to his death. Unlike the pain and suffering awards in the personal injury cases, however, the awards here present relatively uncomplicated issues upon review.
 
 
 83
 We note first than an award for pain and suffering is a proper element of damages in a Jones Act action for the recovery of the pecuniary loss resulting from the death of a seaman where it can be shown that the decedent experienced such suffering before his death. St. Louis, I.M. & S.R. Ry. v. Craft, 237 U.S. 648, 35 S.Ct. 704, 59 L.Ed. 1160 (1915); Cleveland Tankers, Inc. v. Tierney, supra, 169 F.2d at 626. Therefore, the issue for our determination is whether there was any evidence from which the Commissioners could reasonably find that the decedents experienced pain and suffering in connection with their deaths.
 
 
 84
 Shipowners do not dispute the propriety of an award for pain and suffering, but they vigorously contend that no award for pain and suffering was justified in any of the death cases here because there was no evidence of any of the circumstances surrounding the deaths of the crewmen, much less any affirmative evidence that those crewmen experienced pain and suffering at that time. We disagree. An eyewitness account of the circumstances of the deaths is not essential to such an award. Such evidence does, however, establish that some of the decedents were last observed performing their assigned duties below deck after the collision between the Cedarville and the Topdalsfjord. During this period of time the Cedarville was rapidly taking on water despite the efforts of the crew to halt it, thus permitting the inference that these decedents met their deaths by drowning in those inrushing waters while engaging in an unsuccessful struggle to save the ship. Moreover, it must be remembered that the survivors described the impact of the Cedarville and the Topdalsfjord as relatively 'soft', thus permitting the further inference that it was unlikely that any of the decedents would have been rendered unconscious prior to their final moments. Other decedents were last observed on the deck or in lifeboats but presumably were hurled into the water as the ship capsized and sank. These circumstances, too, give rise to the almost inescapable inference that those crewmen died by drowning, and nothing in those circumstances suggests that they were rendered unaware of their fate. Under such circumstances, an award for pain and suffering cannot be said to be error. See Grantham v. Quinn Menhaden Fisheries, Inc., 344 F.2d 590 (4th Cir. 1965); Petition of Marina Mercante Nicaraguense, S.A., supra, 248 F.Supp. 15, 28 (S.D.N.Y.1965) (The El Salvador); Meehan v. Central R.R., 181 F.Supp. 594, 625-626 (S.D.N.Y.1960).
 
 
 85
 Having thus determined that there was sufficient evidence from which the Commissioners could find that the decedents experienced pain and suffering prior to their deaths, our review with respect to this issue is closed. Despite claimants' assertion that the awards of $5,000 were adequate in light of the 'excruciating and agonizing suffering that decedents experienced' and Shipowners' implicit argument that the amount was excessive, we will not attempt to substitute our judgment for that of the Commissioners. The awards for pain and suffering in the death cases will not be disturbed.
 
 
 86
 c. Loss of Consortium and Loss of Counsel and Guidance to the Widows and Loss of Love, Companionship and Guidance to the Adult Emancipated Children.
 
 
 87
 In the course of their determinations in the death cases, the Commissioners awarded sums to the widows of the deceased seamen for the loss of their husband's counsel and guidance and also for their loss of consortium, and sums to the adult emancipated children for the value of the love, companionship and guidance which those children would have received from their decedent. The propriety of these awards is the basic issue common to all.
 
 
 88
 As has been noted elsewhere, the jurisdictional basis for the death claims against the defendant United States Steel was the Jones Act, 46 U.S.C. 688 (and by incorporation, the Federal Employers' Liability Act, 45 U.S.C. 51 et seq.) because the deceased crewmen were employees of United States Steel. The basis for corresponding claims against defendant Den Norske was the general maritime law as supplemented by the Michigan Wrongful Death Act (M.C.L.A. 600.2922), because of the absence of any employer-employee relationship between the decedents and Den Norske and the occurrence of the accident within the territorial waters of the State of Michigan. Under those statutes the liability of both defendants is limited to the pecuniary loss occasioned by the death of the family head, and the issue presented with respect to each of the above named items for which the Commissioners made awards is whether those items can properly be considered elements of pecuniary loss arising out of the decedents' deaths.
 
 
 89
 More specifically, the issue with respect to the awards for loss of counsel and guidance to the widows is whether loss of counsel and guidance is a proper element of pecuniary loss in a Jones Act action for damages by an administratrix of a deceased seaman.
 
 
 90
 The touchstone for any consideration of the propriety of an award in a Jones Act case for the loss of a decedent's counsel, care and guidance is Michigan Central R.R. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913). In that case, an action under the Federal Employers' Liability Act, 45 U.S.C. 51 et seq., to recover damages for the wrongful death of a railroad employee, the Supreme Court held that the trial court committed prejudicial error in permitting the jury to consider and award damages to the decedent's widow for the loss of the care and advice of her husband. After reiterating the rule that damages in an FELA action, as in a Jones Act action, are limited to the pecuniary loss incurred by reason of the decedent's death, the Court stated in relation to the charge therein that it 'threw the door open to the wildest speculation. The jury was no longer confined to a consideration of the financial benefits which might reasonably be expected from her husband in a pecuniary way.' 227 U.S. at 73, 33 S.Ct. at 197. Since the Supreme Court's decision in Michigan Central, no case arising under the Jones Act to which we have been referred by the parties or which has been disclosed by our own research has permitted an award for the loss to the widow of the decedent's care and guidance. See e.g., Petition of Marina Mercante Nicaraguense, S.A., 248 F.Supp. 15 (S.D.N.Y.1965), modified 364 F.2d 118 (2d Cir. 1966); Petition of Oskar Tiedemann & Co., 236 F.Supp. 895 (D.Del.1964); Petition of Petroleum Tankers Corporation, 204 F.Supp. 727 (S.D.N.Y.1960); Petition of Moore-McCormack Lines, Inc., 184 F.Supp. 585 (S.D.N.Y.1960), modified sub nom., Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583 (2d Cir. 1961).
 
 
 91
 Notwithstanding the paucity of authority to support such an award, the claimants and the Commissioners seize upon certain language in Michigan Central to justify the awards, as follows:
 
 
 92
 'It is not beyond the bounds of supposition that by the death of the intestate his widow may have been deprived of some actual customary service from him, capable of measurement by some pecuniary standard, and that in some degree that service might include as elements 'care and advice.' But there was neither allegation nor evidence of such loss of service, care, or advice.' 227 U.S. at 74, 33 S.Ct. at 197.
 
 
 93
 Claimants contend that here there were allegations and evidence of loss of care and advice and that the awards should therefore be permitted to stand. We disagree. The entire thrust of Michigan Central is that the pecuniary loss standard of FELA and Jones Act cases requires specific evidence of both the nature of the services lost and the cost of obtaining such services elsewhere. The Court stated:
 
 
 94
 'The word(s) (pecuniary loss) as judicially adopted (are) not so narrow as to exclude damages for the loss of services of the husband, wife, or child, and, when the beneficiary is a child, for the loss of that care, counsel, training, and education which it might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation.' 227 U.S. at 71, 33 S.Ct. at 196.
 
 The Court further stated:
 
 95
 'A minor child sustains a loss from the death of a parent, and particularly of a mother, of a kind altogether different from that of a wife or husband from the death of the spouse. The loss of society and companionship, and of the acts of kindness which originate in the relation and are not in the nature of services, are not capable of being measured by any material standard. But the duty of the mother to minor children is that of nurture, and of intellectual, moral, and physical training, such as, when obtained from others, must be for financial compensation.' 227 U.S. at 73, 33 S.Ct. at 197.
 
 
 96
 We believe these excerpts must be read as limiting an award for loss of care and guidance to those cases in which the services of the decedent constituting such care and advice can be enumerated and their replacement value estimated. Here there was no evidence of the nature of the care, guidance or counsel which the decedents gave to their wives prior to their deaths which could 'only be supplied by the service of another for compensation,' much less any showing that any such care or counsel had any pecuniary value. Under such circumstances the award was improper and must be vacated. Cf. First National Bank in Greenwich v. National Airlines, Inc., 288 F.2d 621 (2d Cir.), cert. denied, Kessler v. National Airlines, 368 U.S. 589, 82 S.Ct. 102, 7 L.Ed.2d 57 (1961); Meehan v. Central R.R., 181 F.Supp. 594 (S.D.N.Y.1960).
 
 
 97
 The precise issue with respect to the Commissioners' awards for loss of consortium to the widows and for loss of love, companionship and guidance to the adult children, applied only against defendant Den Norske under the Michigan Wrongful Death Act, is whether the definition of pecuniary loss is to be governed by the principles of the general maritime law or by Michigan law interpreting that state's wrongful death statute. If the principles of general maritime law control, the awards for loss of consortium to the widows were improper because the general maritime law does not recognize that item as an element of pecuniary loss. Igneri v. Cie de Transports Oceaniques, 323 F.2d 257 (2d Cir.), cert. denied, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964); Simpson v. Knut Knutsen, O.A.S., 296 F.Supp. 1308 (N.D.Cal.1969); Valitutto v. D/S I/D Garonne, 295 F.Supp. 764 (S.D.N.Y.1969). But Michigan courts construing that state's wrongful death statute have permitted awards to widows for loss of consortium (e.g., Montgomery v. Stephan, 359 Mich. 33, 101 N.W.2d 227 (1960)).[9]
 
 
 98
 While the question is one of first impression in this Court, we believe that under recent developments in the law the entire proceedings against Den Norske, including the measure of damages, are governed by the principles of maritime law.
 
 
 99
 The Commissioners' determination to apply Michigan law to the question of the measure of damages applicable to Den Norske appears to have resulted from their misplaced reliance upon certain language in Michigan Central v. Vreeland, supra, but that determination had some basis in light of the then existing state of the law. Prior to its decision in Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Supreme Court had uniformly held that there was no liability for wrongful death under the general maritime law, and that absent a statutory right thereto, there could be no recovery by the next of kin of a decedent killed as the result of a maritime tort. Such was the rule of The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), but its venerable teaching was specifically overruled by Moragne v. States Marine Lines, supra. Long before the overruling of The Harrisburg, the stringency of its rule denying recovery for wrongful death in admiralty under the maritime law led to the creation of exceptions to that rule. One of the judicially created exceptions to the stringent rule of The Harrisburg was that 'where death * * * results from a maritime tort committed on navigable waters within a state whose statutes give a right of action on account of death by wrongful act, the admiralty courts will entertain a libel in personam for the damages sustained by those to whom such right is given.' Western Fuel Co. v. Garcia, 257 U.S. 233, 242, 42 S.Ct. 89, 90, 66 L.Ed. 210 (1921).
 
 
 100
 The development and application of this exception to the general rule denying recovery inevitably led to questions of the appropriate substantive law to be applied where recovery was sought in one jurisdiction under a right created by another jurisdiction. In response, the courts fashioned a test of looking to the origin of the right sought to be enforced, holding that the court was bound to apply the law of the jurisdiction in which the right originated. See The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); Garrett v. Moore-McCormack, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942); Curtis v. A. Garcia Y Cia, 241 F.2d 30 (3rd Cir. 1957). While it does not appear that the Commissioners engaged in such a reasoning process in making their determination, application of the test set forth above could lead to the result that the measure of damages applicable against Den Norske was to be governed by the Michigan courts' interpretation of the Michigan Wrongful Death Act since, prior to Moragne v. States Marine Lines, supra, the claimants' right to recovery against Den Norske was rooted in that statute.
 
 
 101
 The decision of the Supreme Court in Moragne v. States Marine Lines, supra, which held that an action does lie under the general maritime law for wrongful death caused by a maritime tort, changes that result. Creation of a right of recovery for wrongful death under the maritime law eliminates the need for both the exception to the rule denying recovery and for the tests designed to implement that exception and permits all facets of that right of recovery, including the measure of damages, to be governed by the principles of the maritime law. We therefore hold the awards for loss of consortium to the widows and for loss of love, companionship and guidance to the adult children, applicable only against Den Norske, to have been error. In so holding we recognize that in the proceedings below liability against Den Norske was premised upon the Michigan Wrongful Death Act. However, liability had never been in issue in this case, so the Supreme Court's creation of an additional or alternative basis for Den Norske's liability to the death claimants is of little importance compared to the pervasive issue with respect to all claims, i.e., the appropriate measure of damages. Recognition of a right of recovery for wrongful death under the general maritime law strongly dictates that in order to promote the uniformity and supremacy of the maritime law (See Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917)), the measure of recovery must be governed by the principles of that law where, as here, there is a conflict between the damages recoverable under the general maritime law (Igneri v. Cie de Transports Oceaniques, supra; Simpson v. Knut Knutsen, O.A.S., supra; Valitutto v. D/S I/D Garonne, supra) and those recoverable under state law (Montgomery v. Stephan, supra). Accordingly, upon the remand hereinafter ordered, the District Court is instructed not to allow damages to any claimants with respect to either loss of consortium to the widows or loss of love, companionship and guidance to the adult emancipated children.
 
 
 102
 d. The Awards of Prejudgment Interest and the Failure to Discount Future Damage Awards to Present Value.
 
 
 103
 The two remaining significant issues can be quickly disposed of since they represent instances of the Commissioners' clear disregard of well established law of this Circuit.
 
 
 104
 In each of the death cases the Commissioners awarded prejudgment interest for the total dollar value of the awards from the date of death to the date of judgment. Such an award of prejudgment interest was error. Cleveland Tankers, Inc. v. Tierney, 169 F.2d 622 (6th Cir. 1948).
 
 
 105
 The second issue concerns the Commissioners' failure to discount to present value the awards for future damages in all of the cases. The Commissioners' refusal to include in their computation of damages a reduction of future damages to present value was based upon their assumption that inflationary trends resulting in a loss in the purchasing power of the dollar by 4% Per annum would offset any reduction to present worth at 4% Simple interest. This was error. It is well settled that an award for future damages must be reduced to present value in order to take into account the earning power of that money. Chesapeake & Ohio Ry. v. Kelly,241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). It is equally well settled in this Circuit that the prospect of a future decline in the purchasing power of the dollar may not be used to offset the reduction to present value. Sleeman v. Chesapeake & Ohio Ry., 414 F.2d 305 (6th Cir. 1969).[10]
 
 
 106
 Accordingly, in conjunction with the remand hereinabove directed, the District Court is directed to discount to present value all awards for future damages in accordance with generally accepted actuarial principles.[11]
 
 
 107
 e. Recapitulation as to Death Claims.
 
 
 108
 Items in the death claims which we have hereinabove determined were erroneously included in the awards as a matter of law are the awards to the widows for the loss of consortium and for the loss of their decedent's counsel, care and guidance, the awards to the adult, emancipated children for loss of love, companionship and guidance and the award of prejudgment interest on the total value of the awards for the interim period between the date of death and the date of judgment. On remand the District Court is instructed not to allow damages on account of these items. On such remand the District Court is further instructed to reevaluate and recompute the earnings capacity loss of each death claimant in accordance with the principles herein enunciated, specific reference being to the determination of the proper earnings base for the computation of such earning capacity loss. The District Court is further instructed to discount to present value that portion of the award to each death claimant representing future damages in accordance with the principles herein enunciated. (Such instruction also has application to the personal injury claims; the District Court is similarly instructed to discount to present value that portion of the award to each personal injury claimant representing future damages.) In all other respects, no error is found to have intervened in the determination of damages in the death claims.
 
 
 109
 III. CONCLUSION.
 
 
 110
 The judgments of the District Court are vacated, and the causes are remanded for further proceedings consistent with the foregoing.
 
 
 
 [1]
 Den Norske's petition was filed in the District Court for the Northern District of Illinois, Eastern Division, but was subsequently transferred to the Northern District of Ohio, Eastern Division, wherein the United States Steel Petition was originally filed
 
 
 [2]
 We are aware of Shipowners' dissatisfaction with that statement, and we do not by this reference adopt it
 
 
 [3]
 The only matter in the record remotely touching on this issue are the arguments of counsel at the time the objection to the admission of the psychiatric opinion testimony was made:
 'Mr. Keig (Attorney for Den Norske): Doctor, excuse me. I would like to object to the doctor testifying as to the history he took from this man. The law is clear that examining physicians may not state the history and that their opinion must be based upon evidence otherwise adduced.
 'The Commissioner: I think that a history is proper at this time. If he is the treating doctor and saw him on February 25th, 1967, obviously for the purpose of treatment, or as an analyst, or for the purpose of testifying as an expert, I think he can testify as to that.
 'Mr. Keig: Mr. Commissioner, that is exactly the point, and you are right. The thing here is he did not see him for treatment, but solely for examination for the purpose of testifying, and that forms the foundation for our objection, because the law is clear that in those cases he may not read his history.
 'The Commissioner: Mr. Freedman. (Attorney for Claimants)
 'Mr. Freedman: I don't offer the history which he obtained from the client as the truth of those statements. I offer them, as you said before-- and this is consistent with the law, too. As a matter of fact, the law is universal on this point, that for the purpose of his making a diagnosis and drawing any kind of a conclusion, he needs to have the history, and to that extent it is very relevant.'
 Whereupon the objection was overruled and the doctor proceeded to testify as outlined above, diagnosing the psychic disturbances of the claimants on the basis of the history and subjective symptoms related to him by the claimants.
 
 
 [4]
 An explanation for this distinction may be found in the fact that, according to the Commissioners' Awards and Opinions, Commissioner Grogan 'assumed specific responsibility' for the awards in the Idalski and Tulgetske claims, while Commissioner Schroeder 'assumed specific responsibility' for all of the other claims
 
 
 [5]
 One brief filed in connection with one of the death claims inferentially attempts to discredit Drlik by arguing that it adopted the rule from two Second Circuit cases (Porello v. United States, 153 F.2d 605 (1946) and Carroll v. United States, 133 F.2d 690 (1943)), and then contending that these cases were subsequently overruled by LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2d Cir. 1965). However, LeRoy is distinguishable on its facts and is entirely without present application. It is further argued that Petition of Marina Mercante Nicaraguense, S.A., 248 F.Supp. 15 (S.D.N.Y., 1965), modified 364 F.2d 118 (2d Cir. 1966) (The El Salvador) reaffirmed the Second Circuit's rejection of Drlik's 'averaging out' theory, but The El Salvador used the year prior to death as the base for awards, noting that these earnings were 'consistent with * * * previous earning record(s)', and its conclusions are in no way inconsistent with those reached herein. The next year the Second Circuit in Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961 (2d Cir. 1967), affirming the decision reported at 251 F.Supp. 654 (S.D.N.Y. 1966) approved the establishment of a claimant's earning capacity by averaging his earnings for the six years preceding the accident
 
 
 [6]
 In Drlik, to determine lost earning capacity this Court used as a base the average of the plaintiff's earnings for the four year period immediately prior to the accident
 
 
 [7]
 The award to Kierzek was an exception to the other awards. His award for future medical services was for the purpose of enabling him to pay weekly visits to a general practitioner rather than seeking psychiatric treatment because of his stated fear of psychiatrists
 
 
 [8]
 
 Claimants' Defendant's Commissioners'
 Percentage of Percentage of Percentage of
 Fringe Benefits Fringe Benefits Fringe Benefits
 to Earnings to Earnings to Earnings
 Loss Loss Loss
 --------------- --------------- ---------------
Lamp 22% 19% 20%
Cook 20% 20% 20%
Fuhrman 16% 11% 15%
Haske 22% 10% 15%
Jones 62% 32% 40%
 
 
 [9]
 The awards to the adult emancipated children for loss of love, companionship and guidance need no further discussion as it is now clear that such an award is not an element of pecuniary loss under the Michigan Wrongful Death Act (Breckon v. Franklin Fuel Co., 383 Mich. 251, 174 N.W.2d 836 (1970), and there is no contention that such an award is a proper element of damage under the general maritime law
 
 
 [10]
 In an attempt to salvage the Commissioners' determination that an offset was justified, claimants contend that the failure to discount to present value would be more than offset by future wage rate increases which they contend the Commissioners ignored. There is no competent evidence in the record to support this contention
 
 
 [11]
 We recognize that the determination of the discount rate to be applied to an award for future damages rests within the sound discretion of the District Court. While we have serious reservations about a discount rate at 4% In light of the available return on investments today, we cannot say that the Commissioners' selection of 4% Was an abuse of discretion. However, as pointed out above, such rate should be compounded in accordance with generally accepted actuarial principles